# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dieufort St. Fleur,              :
                                           :
                  Petitioner   :
                                           :
                    v.           : No. 1222 C.D. 2016
                                       : Submitted: December 9, 2016
Workers' Compensation Appeal   :
Board (Anvil International, Inc.),   :
                                           :
                  Respondent :

BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                                    FILED: June 21, 2017

Dieufort St. Fleur (Claimant) petitions for review of the order of the Workers' Compensation Appeal Board (Board) affirming the decision of a workers' compensation judge (WCJ) that granted the petition of Anvil International, Inc. (Employer) to terminate Claimant's compensation benefits pursuant to the Pennsylvania Workers' Compensation Act (Act).[1] We affirm.

On June 30, 2014, Claimant sustained an injury in the nature of a left shoulder strain while using a hammer to break a fitting apart in the knock-off position while in the course and scope of his employment with Employer. Employer accepted Claimant's work-related injury through a medical-only Notice

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§1-1041.4, 2501-2708.

of Compensation Payable (NCP). On February 4, 2015, Claimant's employment was terminated based on his refusal to perform the duties of a sorting position.

On March 16, 2015, Claimant filed a petition for reinstatement and review of his compensation benefits and for review of his medical treatment. Claimant sought the reinstatement of benefits as of January 16, 2015, and an update to the description of his work-related injury to include right elbow lateral epicondylitis. Employer filed an answer denying all of the material allegations.

On August 25, 2015, Employer filed a petition to terminate Claimant's benefits as of August 3, 2015, based upon the opinion of Randall Culp, M.D., a board certified orthopedic and hand surgeon, that Claimant had full recovery from his work-related injury. Claimant filed an answer denying all of the material allegations. The petitions were consolidated for disposition by the WCJ.

Claimant testified regarding the occurrence of his work-related injury and stated that he still has left shoulder and right elbow pain although he is not currently treating with a doctor. He stated that he has only treated with Dr. Baublitz and had surgery on his left shoulder on September 5, 2014. He testified that he was out of work from September 5 through November 21, 2014, and received compensation benefits during that period. Claimant stated that he was examined by John Perry, M.D., a board certified orthopedic surgeon, but denied that Dr. Baublitz released him to full duty work without restrictions as of February 5, 2015, or that Dr. Perry released him to work with a 40-pound weight restriction.

Claimant also testified regarding the circumstances underlying his separation from employment. He stated that he was given a work restriction on January 8, 2015, but that Charles Chudzik, Employer's second shift supervisor, assigned him to both a grinding position and the knock-off position. He testified

that he told Chudzik that he could complete the grinding job, but not the knock-off job, and that he was later suspended. Claimant stated that he did not call Ron Pryor, Employer's human resources manager, as instructed, but that he was kicked out of Pryor's office after trying to speak with Pryor in person. He testified that he was ultimately fired during a meeting with Pryor and his union steward, Joe Thode. The WCJ rejected Claimant's testimony as not credible because his testimony regarding his work assignment and termination "does not align with the credible testimony of [Employer's] fact witnesses, nor does it correspond to the testimony provided by Claimant's witness, Meriguez Cassy." WCJ Decision at 12.

Meriguez Cassy testified that he does not know Claimant personally and only knows him from church. He testified that he previously worked for Employer and was with Claimant as he drove to a doctor's appointment on January 27, 2015. Cassy stated that he overheard Claimant's call to Pryor, accompanied Claimant to obtain Claimant's medical restriction, and that he was present at the meeting with Claimant, Pryor, and the union representative to act as Claimant's interpreter.[2] He testified that he tried to make an agreement at the meeting to preserve Claimant's employment. He stated that he was aware that Dr. Baublitz thought that Claimant was fully recovered from his injuries. The WCJ rejected Cassy's testimony as not credible because his "testimony contradicts the testimony of the Claimant [and] does not align with the credible testimony of [Employer's] fact witnesses. WCJ Decision at 12.

Gary Greve, D.C., testified for Claimant, stating that he initially treated Claimant in October 2015, when Claimant reported he was injured while using a sledge hammer in a repetitive motion and complained of left shoulder pain.

---

[2] Claimant's first language is Creole. Reproduced Record (R.R.) at 10a.

He found that Claimant showed signs of cervical spine, upper thoracic complaints, right elbow pain and right wrist pain even though Claimant's radio graphs showed nothing to suggest any internal structure issues of the shoulder. Dr. Greve diagnosed Claimant with impingement syndrome secondary to postsurgical scarring and complicated by the dyskinesia of the shoulder. He treated Claimant with neck and spine adjustments and manipulations numerous times between October 2015 and January 2016. He acknowledged that Claimant was released to full duty work in February 2015, by Dr. Baublitz, and that he reviewed the report of Dr. Perry noting that Claimant had no problem putting his shirt on after refusing to move the shoulder, and admitted that Claimant's complaints of pain were subjective with no diagnostic support. Although he believed that Claimant's shoulder had no structural defects, Dr. Greve felt that Claimant had a failed surgical intervention due to Claimant's complaints of pain. He acknowledged that he did not see any MRIs or CT scans and had no diagnostic studies to show if internal scarring was tethering adjacent tissues. Nevertheless, Dr. Greve still felt that Claimant had postsurgical scarring causing impingement syndrome. The WCJ rejected Dr. Greve's testimony because his "opinions were based simply on the Claimant's own self reporting of pain, despite Dr. Greve's admission that the Claimant's left shoulder was structurally sound." WCJ Decision at 12.

Dr. Perry testified for Claimant, stating that he examined Claimant on May 4, 2015, and noted that Claimant refused to provide any active abduction in his left shoulder, but could easily move the left shoulder when putting on a shirt at the end of the examination. He stated that Claimant reported tenderness everywhere including his right elbow and refused to lift his arm to allow for impingement testing. He diagnosed Claimant with a left shoulder strain and right

4

elbow pain of uncertain cause. He thought that Claimant had an inconsistent examination, would not move anything on examination, and had many subjective complaints without support. He confirmed that his physical examination was limited by Claimant's refusal to move the shoulder and admitted that Dr. Baublitz released Claimant to work without restrictions. He stated that he would not treat Claimant at all for any lingering injuries. Nevertheless, Dr. Perry indicated that Claimant was not fully recovered from the shoulder injury based on the subjective complaints and imposed restrictions limiting lifting and carrying to 40 pounds. The WCJ found Dr. Perry's testimony not credible because "his own report notes the inconsistent effort provided by Claimant." WCJ Decision at 12.

Chudzik testified for Employer, stating that he was tasked with assigning Claimant a job within his restrictions and that he never assigned Claimant to the knock-off position. He confirmed that he received Claimant's January 8, 2015 restrictions limiting Claimant to lifting 20 pounds and precluding Claimant from the knock-off position with his right arm. He stated that, in light of these restrictions, he assigned Claimant to the off-line sorting position that Claimant has been trained for and had previously performed. Chudzik testified that the sorting position could be performed with one-arm, but that Claimant refused, indicating that he would not work in that position. He stated that, within his presence, Thode spoke with Claimant and told Claimant that the sorting position was within Claimant's restrictions and that Claimant had to work in that position. Chudzik testified that, nevertheless, Claimant said that he would not perform the job and that Employer could fire him. He stated that Claimant was ultimately suspended due to the refusal to perform the sorting position even though

5

Claimant had worked in the grinding position and in the sorting position a week or two prior to Chudzik's request.

Thode testified for Employer, stating that he is a foundry lead employee and the union steward. He stated that he worked the second shift with Claimant and spoke to Claimant in English. He stated that on January 15, 2015, he was summoned because Claimant's supervisor had placed Claimant in a line sorting light duty position, but that Claimant refused the position. He testified that he explained to Claimant that the supervisor needed Claimant in the position, but Claimant indicated that he could not perform hard work. Thode stated that he informed the supervisor and the union vice president after Claimant continually refused the position. He testified that on January 16, 2015, Claimant again refused to work in the sorting light duty position before and after the meeting with Pryor. Thode indicated that he advised Claimant not to give up his job and to simply work the light duty position, but that Claimant still refused.

Pryor testified for Employer, stating that Chudzik informed him that Claimant was given an assignment within his restrictions on January 15th, but refused the assignment and that Claimant again refused the position when offered the following day. He stated that Claimant was then brought to his office with Chudzik and Thode where they discussed the line sorting position and noted that it was within Claimant's restrictions because it is considered to be the lightest job on the foundry side and can be performed with one hand. He testified that, nevertheless, Claimant refused the position. Pryor stated that Claimant appeared at his office on January 27, 2015, and presented a doctor's note that he could not perform the knock-off position and that Claimant was given one more opportunity to perform the sorting work, but still refused the position. He testified that, as a

6

result, Claimant's employment was terminated and that Claimant has not filed a grievance regarding his termination. Pryor stated that Employer has a light duty program for injured workers and identified the shop rules and regulations, which provide that a single act of insubordination can result in termination.

William Hertneky, Employer's human resources generalist, testified for Employer, stating that Employer requires an employee to gain English reading proficiency because of a safety test that requires the ability to read and speak English. He stated that he had multiple interactions with Claimant during which they both spoke English. Hertneky testified that he was present at the January 27, 2015 meeting at which Claimant twice refused to perform the sorting position. The WCJ accepted Chudzik's, Thode's, Pryor's, and Hertneky's testimony as credible "to the extent that their testimony shows the Claimant was assigned to a position within his work restrictions, refused the work assignment, and was subsequently terminated after multiple offers." WCJ Decision at 12.

Dr. Culp testified for Employer, stating that he examined Claimant on August 3, 2015, and a Creole interpreter was present throughout. He stated that Claimant reported left shoulder pain from his work-related injury and the related course of treatment. He testified that Claimant was initially released to work with restriction, but ultimately released by Dr. Baublitz to full-time work in February 2015. Dr. Culp explained that he attempted to perform a full examination, but Claimant refused to allow for an active examination of the left shoulder and refused Dr. Culp's attempts to test for impingement syndrome or to specifically analyze the acromioclavicular joint. Although he examined Claimant's left elbow and left wrist, Claimant refused to allow him to complete a full left shoulder examination. He observed that Claimant had no signs of atrophy in his left arm

7

that would be found if Claimant could not use his left arm as Claimant asserted. He stated that Claimant also provided an inconsistent effort on the Jamar grip strength test. Based on his examination and Claimant's records, Dr. Culp diagnosed Claimant with subjective complaints of left shoulder pain without objective support. He found no evidence of a right elbow injury, or of right elbow epicondylitis, because Claimant did not complain of a right elbow injury at the time of examination. He opined that Claimant did not require further treatment for his left shoulder, noting that Dr. Baublitz released Claimant to full duty, and did not believe that Claimant required any work restrictions going forward. The WCJ found Dr. Culp's testimony "more credible than that of Dr. Greve and Dr. Perry [because] Dr. Culp provided a full review of Claimant's medical treatment records, and his exam noted the Claimant's refusal to cooperate." WCJ Decision at 12.

Based on the foregoing, the WCJ found that Claimant fully recovered from his left shoulder injury, that the description of his injury should not be amended, and that Claimant is not entitled to a reinstatement of his benefits. WCJ Decision at 12. As a result, the WCJ concluded that Employer sustained its burden of proof with respect to the termination of Claimant's benefits as of August 3, 2015, through Dr. Culp's competent and credible medical opinions; Claimant failed to sustain his burden of proof with respect to his review petition as the medical opinions of Dr. Culp are more competent and credible than those of Dr. Greve and Dr. Perry; and Claimant failed to sustain his burden of proof with respect to the reinstatement of his benefits. *Id.* at 12-143. Accordingly, the WCJ granted Employer's termination petition, terminated Claimant's benefits effective August 3, 2015, and denied and dismissed Claimant's review and reinstatement petitions.

8

Claimant appealed the WCJ's decision to the Board, arguing that the WCJ erred in granting Employer's termination petition because no witness, including Dr. Culp, testified that Claimant was fully recovered from his work-related injury. In rejecting Claimant's assertion, the Board stated:

> Here, although Dr. Culp did not state specifically that Claimant had fully recovered from his work injury, he did testify that Claimant could return to work without restrictions, was in need of no further medical treatment and that there was no objective support for his subjective complaints. We believe this testimony was sufficient to warrant a termination of benefits. Therefore, we need not disturb the Decision granting [Employer's] Termination Petition.

Board Opinion at 7. Accordingly, the Board affirmed the WCJ's decision and Claimant filed the instant petition for review.[3]

---

[3] As we have explained:

> This Court's scope of review is limited to determining whether there has been a violation of constitutional rights, errors of law committed, or a violation of appeal board procedures, and whether necessary findings of fact are supported by substantial evidence. "Substantial evidence" is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. In performing a substantial evidence analysis, the evidence must be viewed in a light most favorable to the party who prevailed before the WCJ. In a substantial evidence analysis where both parties present evidence, it is immaterial that there is evidence in the record supporting a factual finding contrary to that made by the WCJ; rather, the pertinent inquiry is whether there is any evidence which supports the WCJ's factual finding.

* * *

> [Additionally,] it is well settled that, in a workers' compensation proceeding, the WCJ is the ultimate finder of fact. As the fact finder, the WCJ is entitled to accept or reject the testimony of any witness, including a medical witness, in whole or in part.

**(Footnote continued on next page…)**

9

Claimant argues that the Board erred in affirming the WCJ's decision terminating his benefits because the WCJ did not apply the correct burden of proof and Employer's expert, Dr. Culp, never testified that Claimant was fully recovered from his work-related injury so there is no substantial competent evidence supporting the decision. We disagree.

Under Section 413 of the Act, 77 P.S. §772, a WCJ may modify, reinstate, suspend, or terminate compensation benefits on proof that the disability of the claimant has increased, decreased, recurred, or has temporarily or permanently ceased. *Broughton v. Workers' Compensation Appeal Board (Disposal Corporation of America)*, 709 A.2d 443, 445 (Pa. Cmwlth.), *appeal denied*, 727 A.2d 133 (Pa. 1998). To sustain its burden of proof with respect to a termination petition where a claimant continues to complain of pain, an employer must provide unequivocal expert medical testimony that, within a reasonable degree of medical certainty, the claimant has fully recovered and can return to work without restrictions, and that there are no objective medical findings that either substantiate the claimant's complaint of pain or connect it to the work-related injury. *Thompson v. Workers' Compensation Appeal Board (Sacred Heart Medical Center)*, 720 A.2d 1074, 1077 (Pa. Cmwlth. 1998) (quoting *Udvari v.*

---

**(continued…)**

> Questions of credibility and the resolution of conflicting testimony are within the exclusive province of the fact finder. Thus, determinations as to witness credibility and evidentiary weight are within the exclusive province of the WCJ and are not subject to appellate review

*Washington v. Workers' Compensation Appeal Board (Pennsylvania State Police)*, 11 A.3d 48, 54-55 n.4, 57 n.6 (Pa. Cmwlth. 2011) (citations omitted).

*Workmen's Compensation Appeal Board (USAir)*, 705 A.2d 1290, 1293 (Pa. 1997)).

Regarding the requirement that the medical expert opine that the claimant has "fully recovered," we noted in *Thompson* that "the failure of the employer's expert to employ these 'magic words' is not fatal to the employer's claim. Instead, the expert testimony must be reviewed in its entirety to determine whether the conclusions reached are sufficient to warrant [the] termination of benefits." *Thompson*, 720 A.2d at 1077 (citation omitted). We again referred to the Supreme Court's opinion in *Udvari*, 705 A.2d at 1293 n.3, noting that it is "sufficient that [the] physician testified to releasing [the] claimant to work without restrictions because [the] work-related injury was resolved." *Thompson*, 720 A.2d at 1077.

In *Broughton*, we concluded that the expert medical testimony was sufficient to support an employer's termination petition even where the testifying medical expert only opined regarding: his review of the claimant's medical records and examination of the claimant; his opinion that the examination resulted in negative findings relating to the claimant's work-related injuries; his admission that previous tests revealed a bulge at the claimant's discs, but that he found no objective evidence of herniation or other neural compromise; and his opinion that the claimant was capable of returning to his pre-injury employment as a garbage truck driver without restriction. *Broughton*, 709 A.2d at 444. Even though the medical expert made no comments at all about the extent of the claimant's recovery, we held that "[a] medical opinion that, as here, is unequivocally rendered is sufficient without resort to 'magic words' such as 'fully recovered.'" *Id.* at 446.

11

Contrary to Claimant's assertion herein, Dr. Culp's testimony in the instant matter provides similar qualitative content to support the termination of his compensation benefits.[4]  Dr. Culp referenced his review of Claimant's records, he

---

[4] In relevant part, Dr. Culp testified as follows:

Q.  And what did you learn in your physical examination?
A.  Well, I learned the following.  One, I learned that [Claimant's] neurological examination was normal.  I learned that his right shoulder motion demonstrated 160 degrees of abduction and forward flexion, which could be considered normal for him.  However, he had very little active range of motion of the left shoulder and essentially refused for me to examine it.

Q.  Now, when you say "refused," what do you mean by that?
A.  It means that when I asked – for example, if I'm going to examine a shoulder I like to do a rotator cuff test.  I like to test his rotator cuff against resistance.  He wouldn't do it.  I like to test for an impingement syndrome, since the surgery that he had done was essentially for impingement syndrome.  He wouldn't let me do an impingement test.  I finally asked him where it hurt and he pointed to his acromioclavicular joint.  I couldn't really find anything wrong with his acromioclavicular joint.

* * *

Q.  [W]as a translator there during your examination?
A.  Yes, yes.  He speaks Creole, and I specifically remember that because I don't see that many IMEs where there is a Creole translator present.

Q.  [W]hat else did you learn in your examination?
A.  I couldn't find any atrophy in any of the musculature of the upper extremity.  I thought if the patient truly could not use his left arm for anything, as he stated in the history, I should see some atrophy in the upper extremity.  I saw none.  As a matter of fact, his circumference measurements of his forearm were normal for a right-handed individual.

**(Footnote continued on next page…)**

12

(continued…)

There was a large discrepancy between active and passive range of motion of the shoulder, of the elbow, of his left wrist even where there was no injuries identified. Those are what I call nonatomic [sic] findings.

I also did a grip strength test using a machine called the Jamar dynamometer. This is mechanically designed to look at various settings. When patients are giving their best effort, the middle setting should be the highest number, regardless of your diagnosis or pain levels. And the results were as follows. On the right side, setting one, 25, setting three, 40, and setting five, 20 pounds. On the left side setting one, 10, setting three, 10, setting five, 10.

The significance of this test, on the right side we see a bell shaped curve. He is giving us effort. On the left side we see a flat line curve, which means he is not giving his best effort, so that is not his real grip strength. He is not giving us his best effort. Also, it doesn't make any sense that he would have such a profound loss of grip strength in the left side for a shoulder problem. His shoulder problem should not affect his grip strength whatsoever.

Q.      Having performed a physical examination of the Claimant, having reviewed his medical records, what was your diagnosis first regarding the Claimant's left shoulder?
A.      My impression on this date was left shoulder pain. And what I meant by that was I didn't have objective support for his subjective complaints, which was left shoulder pain.

Q.      Do you believe the Claimant required any further treatment for his left shoulder?
A.      I do not. And the reason is as follows. As I looked through his medical records, through other treating physicians, including Dr. Baublitz, the surgeon, they also noted symptom magnification, for example, in the July of 2014 records. They also noted much better range of motion in terms of physical therapy than I did.

I, therefore, felt that the patient was not giving me best effort and I could not find anything biologically wrong.

(Footnote continued on next page…)

13

examined Claimant, he recognized and explained his reasons for concluding that Claimant had recovered from his work-related injury based upon his objective findings on examination and review of the records, and he also testified that, in his opinion, he would release Claimant to work without restrictions. As a result,

_____

**(continued…)**

> Q.  In terms of the Claimant's right elbow, do you have a diagnosis regarding the Claimant's right elbow?
> A.  Well, I don't in the sense that there w[ere] no right elbow complaints despite the fact that I asked him about his right elbow because it was one of the questions that was brought up during the review of the records. So, in [the] examination of his right elbow he had a normal range of motion and no complaints. So, again, his impression, if I had had any complaints, would be right elbow pain.
>
> Q.  Did you ever think the Claimant required any type of work restrictions going forward?
> A.  No.
>
> Q.  [W]hat sort of complaints would one make with an elbow epicondylitis?
> A.  First of all, you would complain of right elbow pain. When asked where the pain is located, the patient would point to the outside of the elbow. The patient's pain would be made worse by resistive wrist extension. Those are the classic findings.
>
> Q.  [D]id you perform an analysis of the Claimant's right wrist in terms of extension?
> A.  Yes, I did, and the patient did not express any pain in his elbow during that exam.
>
> Q.  Doctor, have all the opinions you have offered here, have they all been given within a reasonable degree of medical certainty?
> A.  Yes.

R.R. at 63a-65a.

14

Employer presented substantial competent evidence to meet its burden of proof to support the WCJ's decision granting the termination of Claimant's compensation benefits and the Board did not err in affirming that decision.[5]

Finally, Claimant's contention that Dr. Culp's testimony was not competent to support the termination of benefits because he did not review Dr. Greve's records is without merit. A medical expert's opinion is not rendered incompetent unless it is based solely on inaccurate information. *American Contracting Enterprises, Inc. v. Workers' Compensation Appeal Board (Hurley)*, 789 A.2d 391, 396 (Pa. Cmwlth. 2001). "The fact that a medical expert does not have all of a claimant's medical records goes to the weight given the expert's testimony, not its competency." *Marriott Corporation v. Workers' Compensation Appeal Board (Knechtel)*, 837 A.2d 623, 631 n.10 (Pa. Cmwlth. 2003) (citation omitted).[6]

---

[5] We also reject Claimant's averment that the surgery altering the anatomy of his shoulder precluded the termination of his compensation benefits. *See, e.g., Wagner v. Workers' Compensation Appeal Board (O'Malley Wood Products, Inc.)*, 805 A.2d 683, 685 (Pa. Cmwlth. 2002), *appeal denied*, 821 A.2d 589 (Pa. 2003) (holding that the evidence supported a finding that a claimant was fully recovered from a work-related injury even though his L4 and L5 vertebrae were fused because the evidence showed that the claimant had full, uncompromised motion in his back); *Connor v. Workmen's Compensation Appeal Board (Super Sucker, Inc.)*, 624 A.2d 757, 758 (Pa. Cmwlth.), *appeal denied*, 636 A.2d 635 (Pa. 1993) (holding that a loss of muscle mass of the claimant's thigh as a result of the work-related injury does not preclude the termination of benefits because the claimant was "functionally" the same as before the injury).

[6] To the extent that Claimant argues that the WCJ's decision is not reasoned based on Dr. Culp's failure to review Dr. Greve's records, this claim is also meritless. Section 422(a) of the Act, 77 P.S. §834, mandates a WCJ's decision provides findings of fact and conclusions of law. In addition, the decision must specify the evidence relied upon, and explain the reasons for accepting it. Importantly, when conflicting evidence is presented, the Act requires the WCJ to adequately explain his reasons for rejecting or discrediting competent evidence. *Id.* A decision is "reasoned" under the Act if it allows for adequate appellate review by this Court. *Daniels v. Workers' Compensation Appeal Board (Tristate Transport)*, 828 A.2d 1043, 1052 (Pa. 2003). In
**(Footnote continued on next page…)**

Accordingly, the Board's order is affirmed.

_____
MICHAEL H. WOJCIK, Judge

---

**(continued…)**

*Dorsey v. Workers' Compensation Appeal Board (Crossing Construction Co.)*, 893 A.2d 191, 195 (Pa. Cmwlth. 2006), *appeal denied*, 916 A.2d 635 (Pa. 2007), this Court declined to "dissect and analyze" the WCJ's stated reasons for credibility determinations. We likewise will not accede to Claimant's request in this regard in this appeal. The fact that Dr. Culp did not review Dr. Greve's records, which did not exist at the time of his examination of Claimant, does not render his testimony incompetent to support the termination of Claimant's compensation benefits or the WCJ's decision unreasoned.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dieufort St. Fleur,           :
                        :
              Petitioner  :
                        :
              v.         : No. 1222 C.D. 2016
                        :
Workers' Compensation Appeal  :
Board (Anvil International, Inc.),  :
                        :
             Respondent :

# **O R D E R**

AND NOW, this 21st day of June, 2017, the order of the Workers' Compensation Appeal Board dated June 28, 2016, at No. A16-0254 is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge
