**Rodney WASHINGTON, Petitioner**

v.

**WORKERS' COMPENSATION APPEAL BOARD (COMMONWEALTH of Pennsylvania STATE POLICE), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs July 9, 2010.

Decided Jan. 5, 2011.

50

Dana T. Rieder, King of Prussia, for Petitioner.

Richard D. Hollingworth, York, for Respondent.

BEFORE: LEADBETTER, President Judge, and LEAVITT, Judge, and KELLEY, Senior Judge.

OPINION BY Senior Judge KELLEY.

Rodney Washington (Claimant) petitions for review of the order of the Workers' Compensation Appeal Board (Board) affirming the decision of a workers' compensation judge (WCJ) denying Claimant's claim petition for benefits pursuant to the provisions of the Pennsylvania Workers' Compensation Act (Act).[1] We affirm.

Claimant was employed as a Field Trooper with the Pennsylvania State Police (Employer) from 1991 to 2003. In

1994, Claimant began working as an alternate member of the Forensic Services Unit (FSU) by providing forensic and photographic services. Claimant was involved in three homicide investigations while working as an alternate member of the FSU. In 1998, Claimant was involved in the investigation of a murder/suicide in which an estranged father set his vehicle on fire burning himself and his eight-month old infant daughter to death inside. In addition to photographing the vehicle and the bodies at the crime scene, Claimant attended the baby's autopsy and filed a report regarding his documentation of the crime scene via photographs.

Claimant became a full-time member of the FSU in 2003. Claimant's primary investigations as an FSU Trooper were burglaries, motor vehicle thefts, assaults, and some vehicular homicide investigations.

On December 31, 2003, Claimant was called to investigate a homicide involving an infant that later became known as the "Baby Jane Doe" case. Claimant went to the crime scene where he observed a plastic bag sitting upon debris in a 55–gallon burn barrel located by a picket fence near a one-room schoolhouse. He saw an infant girl in the bag. He took photographs of the burn barrel, the infant inside the bag, and the surrounding area. He left the immediate scene to photograph other areas, and he was called back to the crime scene. He saw that the infant had been removed from the barrel and laid upon a plastic blanket. He saw that the top of the infant's head had soot on it, and that the infant's leg, heel and/or knee had been partially burned or charred. After taking photographs of the infant on the blanket, he tilted the infant's head back by placing two of his fingers on her forehead, and saw that the infant's throat had been cut. He observed that the umbilical chord was still

---

1. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4, 2501–2708.

attached to the infant's body. He also attended and photographed the autopsy that was conducted on January 2, 2004. Ultimately, Claimant stopped working for Employer on November 24, 2005.

■■■ On October 26, 2006, Claimant filed a claim petition in which he alleged that he suffered a work related injury in the nature of post-traumatic stress disorder while in the course and scope of his employment with Employer. More specifically, Claimant alleged that the post traumatic stress disorder with which he was diagnosed on December 28, 2005, stemmed from the investigation in the "Baby Jane Doe" case.[2] On November 13, 2006, Employer filed an answer to the claim petition denying all of the material allegations raised therein, and hearings before a WCJ ensued.

In support of the claim petition, Claimant testified and presented the testimony of his wife, Brenda Washington. Claimant also presented the deposition testimony of: William Packard, M.D., a physician practicing in psychiatry; Roger Cadieux, M.D., a physician board certified in psychiatry; and Corporal Anthony Suber, an FSU Trooper.

In pertinent part, Claimant testified regarding his observations and actions while photographing the "Baby Jane Doe" crime scene. See Reproduced Record (RR) at 45a–49a. He indicated that a foreseeable aspect of his FSU job would be investigating homicides regardless of the victim's age, and that all of his activities in the "Baby Jane Doe" investigation were normal and routine activities relating to his FSU job. Id. at 84a–86a. In addition, Claimant stated that it was his understanding that it was mandatory for the Members Assistance Program (MAP) to respond to the scene of a "critical incident" and/or a debriefing afterwards, and that neither occurred in the "Baby Jane Doe" investigation. Id. at 51a. However, he conceded that he knew how he could get in contact with MAP, and that he chose not to do so. Id. at 51a–52a.

Claimant testified that, as a result of his investigation into the "Baby Jane Doe" homicide, he would cry and that he suffered from nightmares. Id. at 53a. Subsequently, on November 24, 2005, Claimant fired a bullet across the side of his chest. Id. at 55a. He was hospitalized for his gun wound, released to a psychiatric hospital, and then released to the Hershey Medical Center where he was diagnosed with bipolar disorder and post-traumatic stress disorder. Id. at 55a–56a, 58a. As a result, Claimant has not been back to work since November 24, 2005. Id. at 60a–61a.[3]

---

2. As this Court has previously noted, "[t]hree types of psychological injuries are compensable under the Act: (1) mental/physical—where a psychological stimulus causes physical injury; (2) physical/mental—where a physical stimulus causes a psychic injury; and (3) mental/mental—where a psychological stimulus causes a psychic injury. These categories require different standards of proof, the last being the most rigorous, requiring proof of abnormal working conditions." *City of Philadelphia v. Workmen's Compensation Appeal Board (Brasten)*, 682 A.2d 875, 878 n. 4 (Pa. Cmwlth.1996), *aff'd per curiam*, 556 Pa. 400, 728 A.2d 938 (1999) (citation omitted).

3. In addition, in support of his claim petition and his assertion that the "Baby Jane Doe" investigation constituted an abnormal working condition, Claimant sought to compel Employer to produce the crime scene and autopsy photographs taken by Claimant during the investigation. *See* RR at 22a–23a, 155a–157a. However, Employer resisted their admission into evidence because the "Baby Jane Doe" investigation was still an open case, and because Claimant had already testified extensively regarding the condition of the infant at the crime scene and the autopsy. *See id.* at 157a. In addition, Lieutenant Allen Krawczel of the Pennsylvania State Police testified re-

In pertinent part, Trooper Suber testified that the most common crime investigated by the FSU is burglary because it is the most common crime committed. RR at 374a, 379a. He stated that, in the last ten years with the FSU, he had investigated up to 100 deaths, including ten cases involving the homicide of a child up to one year old. *Id.* at 374a–375a, 376a. He testified that it was not unusual for an FSU member to be bothered by a homicide, and that Claimant had called to ask him about processing evidence and had mentioned that the "Baby Jane Doe" incident was disturbing. *Id.* at 380a–381a. He stated that all of Claimant's actions were normal for an FSU member based upon his review of Claimant's incident reports relating to the "Baby Jane Doe" investigation. *Id.* at 380a.

In opposition to the claim petition, Employer presented: the deposition testimony of Corporal Govin Martin, the Manager of MAP; the deposition testimony of Sergeant Jeffrey Friedel, the Supervisor of Training and Technical Support of Employer's Bureau of Forensic Services; and the testimony of Lieutenant Allen Krawczel, the Crimes Section Commander of Troop J.

In pertinent part, Corporal Martin testified that "critical incidents" are foreseeable incidents in which troopers will be involved, and that the term is not analogous to an abnormal working condition.

RR at 743a–745a. He stated that death or injury to a child is one of five examples of "critical incidents". *Id.* at 755a. He indicated that the purpose of MAP is to assist troopers with various problems, and that if an MAP is not on the scene of what is perceived to be a "critical incident", a trooper can call a peer contact or personnel. *Id.* at 746a–748a. He testified that Claimant could have contacted Corporal Joseph Christaldi, a peer contact of MAP, from the crime scene but that he chose not to do so. *Id.* at 769a–770a. He stated that seeing dead children is a part of a trooper's job, that Claimant's activities with respect to the "Baby Jane Doe" homicide were not abnormal or out of the ordinary for FSU troopers, and that the lack of an MAP member at the crime scene was not an abnormal working condition. *Id.* at 749a–752a, 766a–768a.

In pertinent part, Sergeant Friedel testified that FSU members must deal with cadavers of any age, and that Claimant's activities relating to the "Baby Jane Doe" incident were routine. RR at 830a–831a. He stated that it is foreseeable that FSU members would deal with homicide victims of any age or gender as is the case with patrol officers. *Id.* at 835a–836a. He testified that since FSU members deal with cadavers more often than other members of the Pennsylvania State Police, such incidents generally become more routine for

garding the admission of the photographs, in pertinent part, as follows:

> Q. There have been discussions about the Baby Jane Doe's autopsy photographs, and you've been present during the discussions. Can you tell the Judge the Pennsylvania State Police's position in regard to the submission of such photographs?
> A. We would—since it's an active and open investigation, we have not identified any suspects to this date, nor have we been able to identify the mother of the child, and it's considered an open homicide investiga-tion, we would ask that those photographs not be made part of the record because of the active investigation and the possibility of those getting into the public and potentially contaminate [sic] the integrity of the investigation, and that would be public knowledge for somebody to have access to those, because the evidence that's there is known to us and to the perpetrator.
>
> *Id.* at 206a–207a. Ultimately, the WCJ did not compel Employer to produce the photographs, and none of the photographs were made part of the record of this case.

them. *Id.* at 836a–838a, 839a–840a, 841a. He indicated that FSU members are familiar with the purpose of MAP and how to contact it if needed. *Id.* at 842a–843a.

In pertinent part, Lieutenant Krawczel testified that it was neither abnormal nor unforeseeable for an FSU member in Troop J to participate in two homicide investigations in one month. RR at 166a–167a. Regarding the investigation of the 1998 murder/suicide, in which the father burned himself and his daughter to death, Lieutenant Krawczel stated that Claimant was involved in the investigation, photographed the vehicles and the bodies at the crime scene, and attended the infant's autopsy. *Id.* at 172a–174a. He indicated that Claimant's activities at the crime scene and the autopsy were a normal aspect of his duties with the FSU. *Id.* at 175a. Likewise, he stated that Claimant's activities with respect to the "Baby Jane Doe" investigation were the normal duties of an FSU member. *Id.* at 175a–176a. He testified that an MAP representative cannot automatically be present at every crime scene as there are not enough of them in the program, and because any given situation could give rise to a "critical incident" for any particular trooper. *Id.* at 191a.

On January 28, 2009, the WCJ issued a decision disposing of Claimant's claim petition in which he made the following relevant findings of fact:

35. This Judge finds the testimony of Lieutenant Krawczel and Corporal Martin credible that the absence of an MAP representative at the "Baby Jane Doe" investigation on December 31, 2003 and following does not constitute an abnormal working condition. There is testimony that MAP representatives are not automatically present at every scene and that any personnel including Claimant have the ability and/or responsibility to contact MAP.

36. This Judge finds the testimony of Lieutenant Krawczel, Sergeant Friedel and Corporal Martin more credible than Claimant that Claimant's presence and activities at the "Baby Jane Doe" investigation on December 31, 2003 and following does not constitute an abnormal working condition. Claimant testified that his activities pertaining to the "Baby Jane Doe" investigation were his normal, routine activities relating to his job as an FSU member. Employer's witnesses all testified Claimant's activities were the normal activities of an FSU member. Claimant volunteered to be a forensic trooper. The activities described by Claimant in this case, providing forensic and photographic services, [and] attending autopsies are drawn straight from his job description. Forensic services involve documenting, preserving and collecting physical evidence, which could be the body of a dead infant.

WCJ Decision at 7.

Based on the foregoing, the WCJ concluded that Claimant had not sustained his burden of proving that the alleged work-related injury that he sustained in the nature of post-traumatic stress disorder was based upon an abnormal working condition. WCJ Decision at 7. As a result, the WCJ issued an order denying Claimant's claim petition. *Id.* at 8.

 On February 19, 2009, Claimant appealed the WCJ's decision to the Board. On February 26, 2010, the Board issued an opinion and order affirming the WCJ's decision. Claimant then filed the instant appeal of the Board's order.[4]

4. This Court's scope of review is limited to determining whether there has been a viola-

In this appeal, Claimant contends [5] that the Board erred in affirming the WCJ's decision because: (1) the WCJ erred in determining that Claimant's work-related injury in the nature of post-traumatic stress disorder was not the result of an abnormal working condition; (2) the WCJ erred in failing to consider Claimant's non-work-related preexisting medical condition as it related to his claim for compensation; and (3) the WCJ erred in failing to admit into evidence the crime scene and autopsy photographs taken by Claimant during the "Baby Jane Doe" investigation.

Claimant first contends that the Board erred in affirming the WCJ's decision because the WCJ erred in determining that Claimant's work-related injury in the nature of post-traumatic stress disorder was not the result of an abnormal working condition. More specifically, Claimant asserts that he provided substantial evidence to prove either that his work performance relating to the "Baby Jane Doe" investigation was unusually stressful for his type of job, or that the exposure to this unusual event made his job more stressful than it had been, thereby requiring the grant of benefits.

A party filing a claim petition for workers' compensation benefits must prove that the alleged injury is both work-related and disabling. *Lewis v. Commonwealth*, 508 Pa. 360, 498 A.2d 800 (1985). Because psychological injuries are highly subjective, the occurrence of the injury and its cause must be adequately established. *Wilson v. Workmen's Compensation Appeal Board (Aluminum Company of America)*, 542 Pa. 614, 669 A.2d 338 (1996). Where, as here, the alleged psychological injury was not precipitated by physical injury, the claimant must establish by objective evidence that he suffered a psychological injury and that the injury was more than a subjective reaction to normal working conditions. *Davis v. Workers' Compensation Appeal Board (Swarthmore Borough)*, 561 Pa. 462, 751 A.2d 168 (2000); *Wilson; Martin v. Ketchum, Inc.*, 523 Pa. 509, 568 A.2d 159 (1990). " '[E]ven if a claimant adequately identifies actual (not merely perceived or imagined) employment events which have precipitated psychiatric injury, the claimant must still prove the events to be abnormal before he can recover.' " *Wilson*, 542 Pa. at 626, 669 A.2d at 344 (citation omitted).

As this Court has previously stated:

Whether the working conditions are or are not abnormal is a question which relates to the cause of the injury. Case law in Pennsylvania makes clear that

---

tion of constitutional rights, errors of law committed, or a violation of appeal board procedures, and whether necessary findings of fact are supported by substantial evidence. *Lehigh County Vo–Tech School v. Workmen's Compensation Appeal Board (Wolfe)*, 539 Pa. 322, 652 A.2d 797 (1995). "Substantial evidence" is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *Waldameer Park, Inc. v. Workers' Compensation Appeal Board (Morrison)*, 819 A.2d 164 (Pa.Cmwlth.2003); *Hoffmaster v. Workers' Compensation Appeal Board (Senco Products, Inc.)*, 721 A.2d 1152 (Pa.Cmwlth.1998). In performing a substantial evidence analysis, the evidence must be viewed in a light most favorable to the party who prevailed before the WCJ. *Waldameer Park, Inc.; Hoffmaster*. In a substantial evidence analysis where both parties present evidence, it is immaterial that there is evidence in the record supporting a factual finding contrary to that made by the WCJ; rather, the pertinent inquiry is whether there is any evidence which supports the WCJ's factual finding. *Waldameer Park, Inc.; Hoffmaster*.

5. In the interest of clarity, we reorder the allegations of error raised by Claimant in this appeal.

while abnormal working conditions may be sufficient to link the injury to the employment, subjective reactions to normal working conditions will not. *Martin.* The apparent rationale for this rule is that while some circumstances by their nature may cause psychic injury, others would not work such an injury on a healthy psyche unless there were other elements at play. Accordingly, we have directed our attention to distinguishing between what actually took place at the work place and what was a subjective reaction to those real events. Only when we are satisfied that the actual events could cause a psychic injury, have we held that benefits were proper.

*Calabris v. Workmen's Compensation Appeal Board (American General Companies),* 141 Pa.Cmwlth.405, 595 A.2d 765, 769 (1991).

As the Pennsylvania Supreme Court has noted, " '[p]sychic injury cases are highly fact-sensitive and for actual work conditions to be considered abnormal, they must be considered in the context of the specific employment.' Whether findings of fact support a conclusion that the claimant has been exposed to abnormal working conditions is a question of law that is fully reviewable on appeal." *City of Philadelphia v. Civil Service Commission of the City of Philadelphia,* 565 Pa. 265, 272–273, 772 A.2d 962, 966 (2001) (citation omitted).

This Court has repeatedly recognized that the job of police officer is one which is inherently highly stressful. *See, e.g., Payes v. Workers' Compensation Appeal Board (Commonwealth of PA/State Police),* 5 A.3d 855 (Pa.Cmwlth.2010); *Rydzewski v. Workers' Compensation Appeal Board (City of Philadelphia),* 767 A.2d 13 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 566 Pa. 673, 782 A.2d 551

(2001); *Young v. Workers' Compensation Appeal Board (New Sewickley Police Department),* 737 A.2d 317 (Pa.Cmwlth.1999), *petition for allowance of appeal denied,* 566 Pa. 689, 784 A.2d 121 (2001); *Clowes v. Workmen's Compensation Appeal Board (City of Pittsburgh),* 162 Pa.Cmwlth.583, 639 A.2d 944 (1994), *petition for allowance of appeal denied,* 543 Pa. 697, 670 A.2d 144 (1995).

In this regard, this Court has recently noted:

Although a claimant in a normally highly stressful working environment such as a police officer may not have a higher burden of proof, it is often more difficult to establish abnormal working conditions in a job that is, by its nature, highly stressful. The claimant must establish that the incident that caused his mental injury is so much more stressful and abnormal than the already stressful incidence of that position.

Although testimony may be presented that certain police officers have never witnessed horrible trauma and/or death, that testimony is not necessarily dispositive. The determining factor is what is extraordinary or abnormal for a person in the same "line of work". When an individual claimant employed as a police officer has not previously encountered a particular type of event one may expect a police officer to become involved in, that experience is merely "subjectively abnormal for [the c]laimant." Conversely, however, simply because an event has happened in the past does not mean that such an event is a normal part of a course of employment. . . .

*Payes,* 5 A.3d at 860 (citations omitted).

As noted above, in the instant case, the WCJ found as fact that Claimant's activities with respect to the "Baby Jane Doe" investigation were normal and routine activities relating to his job as an FSU

member. WCJ Decision at 7. More specifically, the WCJ determined that "[t]he activities described by Claimant in this case, providing forensic and photographic services, [and] attending autopsies are drawn straight from his job description. Forensic services involve documenting, preserving and collecting physical evidence, which could be the body of a dead infant." *Id.*

 These findings are amply supported by the certified record of this case. Indeed, Claimant testified that a foreseeable aspect of his FSU job would be investigating homicides regardless of the victim's age, and that all of his activities in the "Baby Jane Doe" investigation were normal and routine activities relating to his FSU job. RR at 84a–86a. Likewise, Corporal Martin, Sergeant Friedel, and Lieutenant Krawczel all testified that Claimant's activities with respect to the "Baby Jane Doe" homicide were not abnormal or out of the ordinary for FSU troopers. *Id.* at 175a–176a, 766a–767a, 835a–836a. More specifically, in relevant part, their testimony supports the WCJ's conclusion that it was a normal working condition for an FSU trooper such as Claimant to view, photograph, and attend the autopsy of the maimed cadaver of an infant such as the victim involved in the "Baby Jane Doe" case. *Id.*[6]

Thus, although such activities may have been unusual for Claimant to endure as a member of the FSU, they do not constitute the requisite abnormal working conditions to support the award of compensation benefits in this case. *See Payes,* 5 A.3d at 861 ("Claimant, who works 'in the line of employment' of a police officer, can be expected to be witness to horrible tragedy. This includes, as acknowledged by Claimant, responding to motor vehicle accidents in an emergency capacity. Undoubtedly, in so doing, he may be subjected to traumatic visuals such as injured children, maimed adults, and, unfortunately, death. These events will not be deemed 'extraordinary' or 'abnormal'. Indeed, it is not beyond the realm of possibility for an officer to have to take someone's life.") (citation omitted); *Rydzewski,* 767 A.2d at 17 ("[I]rrespective of the fact that, in the matter *sub judice,*

---

**6.** In his appellate brief, Claimant contends that he presented sufficient substantial evidence demonstrating a contrary conclusion, that his activities with respect to the "Baby Jane Doe" case constituted abnormal working conditions. *See* Appellant's Brief at 22. In addition, Claimant submits that the WCJ and the Board erred in failing to credit the testimony offered by him in support of his assertion in this regard, and in finding credible the testimony of Employer's witnesses supporting the contrary conclusion. *See id.* at 23–25.

However, it is well settled that, in a workers' compensation proceeding, the WCJ is the ultimate finder of fact. *Hayden v. Workmen's Compensation Appeal Board (Wheeling Pittsburgh Steel Corp.),* 83 Pa.Cmwlth.451, 479 A.2d 631 (1984). As the fact finder, the WCJ is entitled to accept or reject the testimony of any witness, including a medical witness, in whole or in part. *General Electric Co. v. Workmen's Compensation Appeal Board (Valsamaki),* 140 Pa.Cmwlth. 461, 593 A.2d 921,

petition for allowance of appeal denied, 529 Pa. 626, 600 A.2d 541 (1991). Questions of credibility and the resolution of conflicting testimony are within the exclusive province of the fact finder. *American Refrigerator Equipment Company v. Workmen's Compensation Appeal Board (Jakel),* 31 Pa.Cmwlth.590, 377 A.2d 1007 (1977). Thus, determinations as to witness credibility and evidentiary weight are within the exclusive province of the WCJ and are not subject to appellate review. *Hayden.*

As outlined above, there is clearly substantial evidence in the certified record of this case supporting the WCJ's conclusion that Claimant was not subjected to abnormal working conditions in the "Baby Jane Doe" case. As a result, we will not accede to Claimant's request to reweigh the evidence presented to the WCJ, and we will not consider the conflicting evidence supporting the contrary conclusion that he was, in fact, subject to such abnormal working conditions during the course of that investigation.

the seven officers who testified stated that they had neither often nor ever experienced the death and/or maiming of other officers, we agree with the Board that, as a matter of law, Claimant did not prove that he experienced a working condition that was particularly abnormal for a person in his line of work. . . ."); *Young,* 737 A.2d at 322 ("[T]he evidence presented here is insufficient to prove that the stand-off event was an abnormal working condition for a police officer, where certain stressful and even life-threatening events and occurrences are expected and anticipated due to the nature of the employment, regardless of where the officer is employed or for how long the officer has been employed. The fact that Claimant had never before been involved in the type of stand-off situation which occurred on February 12, 1992, at any previous time in his career merely makes the experience subjectively abnormal for Claimant.").[7] As a result, the Board did not err in affirming the WCJ's determination in this regard and Claimant's assertion to the contrary is patently without merit.

■ Claimant next contends that the Board also erred in affirming the WCJ's decision because the WCJ erred in failing to consider Claimant's nonwork-related preexisting medical condition as it related to his claim for compensation. More specifically, Claimant asserts that the WCJ erred in failing to consider that the aggravation of his preexisting mental disorders, including depression, which resulted in the post-traumatic stress disorder, was a compensable psychic injury under the Act.

However, Claimant's assertion in this regard has been specifically rejected by the Pennsylvania Supreme Court. In particular, the court has stated:

As we observed in *Martin,* the [Act] does not provide benefits to a claimant merely because of the claimant's status as an employee.

Abandoning the distinction between normal and abnormal working conditions, as the Appellant urges us to do, would eliminate the element of causation. It would destroy the fundamental principle underlying the scheme of the [Act]—that, in order to be compensable, an injury must be work-related. Under the Appellant's theory, a claimant would have to establish only that the employee suffered from a mental illness while employed and that the illness was a condition created or aggravated by that employee's perception of the conditions of his employment. That would reduce workmen's compensation benefits to nothing more than a disability or death benefit payable only because of the employee status of the claimant—and not because the injury was caused by this employment.

568 A.2d at 165.

*Davis,* 561 Pa. at 473–474, 751 A.2d at 174.

Thus, Claimant was still required to demonstrate by objective evidence that his post-traumatic stress disorder was more than his subjective reaction to normal working conditions in order to recover benefits under the Act. *Davis; Wilson; Martin.* As outlined above, there is clearly substantial evidence in the certified rec-

---

7. *See also City of Philadelphia,* 565 Pa. at 277, 772 A.2d at 969 ("Applying the analysis underlying these decisions, we find that [the claimant]'s involvement in the standoff with an armed suspect did not rise to the level of abnormal working conditions for a police offi- cer. [The claimant] was performing the investigatory and patrol functions expected of a law enforcement officer, and a confrontation with an armed suspect may be anticipated in the course of an officer's duties.").

ord of this case supporting the WCJ's conclusion that Claimant was not subjected to abnormal working conditions in the "Baby Jane Doe" case. *See* RR at 84a–86a, 175a–176a, 766a–767a, 835a–836a. As a result, Claimant is not entitled to receive compensation benefits under the Act, *Payes; Rydzewski; Young;* and neither the WCJ nor the Board erred in this regard.[8]

■ Finally, Claimant contends that the Board erred in affirming the WCJ's decision because the WCJ erred in failing to admit into evidence the crime scene and autopsy photographs taken by Claimant during the "Baby Jane Doe" investigation. More specifically, Claimant asserts that the admission of the photographs would have helped him to demonstrate that he was, in fact, subjected to abnormal working conditions during that investigation.

■ It is well settled that the admission of evidence is within the sound discretion of the WCJ. *Coyne v. Workers' Compensation Appeal Board (Villanova University)*, 942 A.2d 939 (Pa.Cmwlth.), *petition for allowance of appeal denied*, 599 Pa. 683, 960 A.2d 457 (2008); *Atkins v. Workers' Compensation Appeal Board (Stapley in Germantown)*, 735 A.2d 196 (Pa.Cmwlth.1999). In addition, a WCJ

may properly exclude evidence which is irrelevant, confusing, misleading, cumulative, or prejudicial. *1st Steps International Adoptions, Inc. v. Department of Public Welfare*, 880 A.2d 24 (Pa.Cmwlth.2005). Finally, a WCJ's determination regarding the admission of evidence will not be overturned without a showing of an abuse of that discretion. *Atkins.*[9]

In rejecting Claimant's assertion that the WCJ erred in denying the admission of the photographs, the Board stated the following, in pertinent part:

> The [WCJ] denied Claimant's request to submit the photographs. We see no abuse of discretion in that ruling given that they were part of an ongoing investigation, and would do little to enhance the case since testimony regarding the condition of the infant's body had been presented by Claimant ( [RR at 46a–49a] ). Furthermore, presenting the photographs to the [WCJ] would have had very little probative value in relation to the issue of abnormal work conditions for a State Trooper as the [WCJ] is not a Trooper with the Pennsylvania State Police and as such, his reaction to the photographs would certainly be dissimilar to that of a State Police Trooper who is a member of the FSU.

---

8. As a corollary to this claim, Claimant also contends that the failure of an MAP representative to debrief Claimant regarding the incident aggravated his preexisting nonwork-related mental disorders made his post-traumatic stress disorder compensable under the Act. As noted above, the WCJ specifically found that as fact "[t]hat the absence of a [sic] MAP representative at the "Baby Jane Doe" investigation on December 31, 2003, and following does not constitute an abnormal working condition...." WCJ Decision at 7. This finding is amply supported by the testimony of Corporal Martin, Sergeant Friedel, Lieutenant Krawczel. *See* RR at 191a, 746a–748a, 750a–751a, 842a–843a. By failing to successfully demonstrate that he was

subjected to an abnormal working condition, the fact that Claimant's preexisting nonwork-related mental disorders contributed to his subjective reaction to normal working conditions does not support the award of benefits in this case. *Payes; Rydzewski; Young.*

9. As this Court has recently noted, "[a]n abuse of discretion occurs where the WCJ's judgment is manifestly unreasonable, where the law is not applied or where the record shows that the action is a result of partiality, prejudice bias or ill will." *Allegis Group and Broadspire v. Workers' Compensation Appeal Board (Coughenaur)*, 7 A.3d 325, 327 n. 3 (Pa.Cmwlth.2010).

Board Opinion at 13 (footnote omitted). We discern no error in the Board's determination in this regard.

As indicated by the Board, Claimant testified regarding the images that he saw while taking the crime scene and autopsy photographs during the "Baby Jane Doe" investigation. *See* RR at 45a–49a. Thus, the admission of the actual photographs taken by Claimant would be merely cumulative of his oral testimony offered at the hearing before the WCJ. As a result, the WCJ did not abuse his discretion in failing to admit into evidence the crime scene and autopsy photographs. *See Haines v. Workmen's Compensation Appeal Board (Clearfield County)*, 146 Pa.Cmwlth.437, 606 A.2d 571, 578 (1992) ("Under these circumstances, it was within the [WCJ]'s discretion to reject the complaint and accompanying affidavit as cumulative evidence corroborative of the deputy sheriff's hearing testimony which, as discussed above with respect to fact-finding 12, established Claimant's participation in the November 24 incident was not initiated by the deputy sheriff. . . .") (citations omitted); *Smith v. Commonwealth*, 80 Pa. Cmwlth. 117, 470 A.2d 1125, 1127 (1984) ("[A]t the hearing the police officer testified that the appellant had a large cut on his head after the accident and that he transported the appellant to the hospital where several stitches were required to close the wound. The appellant also testified to the injuries he sustained in the accident and that eight stitches were placed in the cut on his head. Since evidence of the appellant's head injury was before the court in the form of oral testimony, there was no need to duplicate such evidence by photographs. The ruling of the trial court was well within its prerogative 'to reject a picture on the ground that the evidence is cumulative or that the photograph is unnecessary.' ") (citations omitted).

Accordingly, the order of the Board is affirmed.

## ORDER

AND NOW, this 5th day of January, 2011, the order of the Workers' Compensation Appeal Board, dated February 26, 2010 at No. A09–0300, is AFFIRMED.