# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Orlando Burgos,                           :
                        Petitioner        :
                                          :
            v.                            :
                                          :
Workers' Compensation Appeal              :
Board (Burnham, LLC),                     :   No. 852 C.D. 2018
                        Respondent        :   Submitted: November 9, 2018

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                              FILED:  February 8, 2019


Orlando Burgos (Claimant) petitions this Court for review of the Workers' Compensation (WC) Appeal Board's (Board) May 22, 2018 order affirming the Workers' Compensation Judge's (WCJ) decision denying Claimant's Claim Petition and Motion to Reopen the Record (Motion).  Claimant essentially presents two issues for this Court's review: (1) whether the Board erred by affirming the WCJ's conclusion that Claimant did not sustain a work-related, repetitive trauma injury and (2) whether the Board erred by affirming the WCJ's decision denying the Motion.[1]  Upon review, we affirm.

---

[1] Claimant presented four issues in his Statement of Questions Involved: (1) whether the Board erred by affirming the WCJ's conclusion that Claimant did not sustain a work-related repetitive trauma injury; (2) whether the Board erred by affirming the WCJ's conclusion that arthritis caused Claimant's hand and wrist condition; (3) whether the Board erred by affirming the WCJ's rejection of Carl E. Becker, II, M.D.'s medical opinion; and (4) whether the Board erred by affirming the WCJ's decision denying the Motion.  *See* Claimant Br. at 5-6.  Because Claimant's first three issues are subsumed in this Court's analysis of the first, they have been combined herein.

Claimant had been employed by commercial-sized industrial boiler manufacturer Burnham, LLC (Employer) since June 26, 2006. His duties required him to use his hands for metal fabrication and boiler assembly. On January 13, 2016, Claimant completed an Employee Injury/Illness Report Form notifying Employer of bilateral wrist and elbow injuries caused by "working constantly," and specifying January 12, 2016 as the injury date.[2] *See* Certified Record (C.R.) Item 15 (Claimant Ex. C-1). On January 29, 2016, Employer issued a Medical-Only Notice of Temporary Compensation Payable. *See* Reproduced Record (R.R.) at 56a-57a.

On February 24, 2016, Employer issued a Notice Stopping Temporary Compensation and a Notice of WC Denial. *See* R.R. at 58a-60a. On March 28, 2016, Claimant filed the Claim Petition seeking total disability benefits from March 8, 2016 because repetitive use of his left and right upper extremities purportedly rendered him unable to perform his job duties. *See* R.R. at 1a-6a. Employer denied Claimant's allegations. *See* R.R. at 7a-9a. WCJ hearings were held on April 29, June 9 and September 15, 2016. In January 2017,[3] Claimant's counsel filed the Motion with the WCJ. On February 2, 2017, the WCJ denied the Claim Petition and the Motion. Claimant appealed to the Board. On May 22, 2018, the Board affirmed the WCJ's decision. Claimant appealed to this Court.[4]

---

[2] Claimant reported on the Employee Injury/Illness Report Form under "prior work-related injuries" that he "[h]ad surgery on both wrist[s] 2014." Certified Record (C.R.) Item 15. Claimant also responded under "[h]ave you previously had a similar injury?" that he "[h]ad surgery on both wrist[s] 2014." C.R. Item 15.

[3] It is not clear from the Motion or the docket when the Motion was filed. However, there is a reference therein to Claimant's counsel being made aware of the need to reopen the record after Employer's counsel filed a reply brief on or about January 12, 2017. *See* R.R. at 192a. Accordingly, the Motion was filed some time between January 12 and February 2, 2017 when the WCJ issued his decision.

[4] "On review[,] this Court must determine whether constitutional rights were violated, errors of law were committed, or necessary findings of fact were supported by substantial competent evidence." *Stepp v. Workers' Comp. Appeal Bd. (FairPoint Commc'ns, Inc.)*, 99 A.3d 598, 601 n.6 (Pa. Cmwlth. 2014).

Claimant argues that the Board erred by affirming the WCJ's conclusion that Claimant did not sustain a work-related, repetitive trauma injury. Specifically, Claimant contends that the WCJ accepted William Kirkpatrick, M.D.'s (Dr. Kirkpatrick) and Claimant's supervisor, operations manager Doug Cross' (Cross), testimony over Claimant's and Carl E. Becker, II, M.D.'s (Dr. Becker) testimony and, thus, the WCJ's "ultimate conclusion[ wa]s wholly contradictory to the [record] evidence." Claimant Br. at 12.

Initially,

> [a]n injured employee seeking to obtain [WC] benefits for a work-related injury bears the burden of proving all elements necessary to support an award. Pursuant to Section 301(c)(1) of the [WC] Act [(Act)[5]], 77 P.S. § 411(1), **an employee's injuries are compensable if they** (1) arise in the course of employment and (2) **are causally related thereto**. Further, an employee must demonstrate that he is disabled as a consequence of the work-related injury. The term 'disability' is synonymous with an employee's loss of earning power.

*Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 75 n.4 (Pa. Cmwlth. 2012) (emphasis added; citations omitted). "[I]n cases where the injury is not attributable to a specific incident and the causal relationship between the injury and the employment is not obvious, unequivocal medical testimony is required to establish this causal relationship."[6] *Rockwell Int'l v. Workers' Comp. Appeal Bd. (Sutton)*, 736 A.2d 742, 744 (Pa. Cmwlth. 1999).

Here, Claimant testified at the June 9, 2016 WCJ hearing that he worked for Employer eight to ten hours a day, five days a week for ten years. *See* R.R. at

---

[5] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2708.

[6] "[M]edical testimony is unequivocal if a medical expert testifies, after providing foundation for the testimony, that, in his professional opinion, he believes or thinks a fact exists." *Amandeo*, 37 A.3d at 80 (quoting *O'Neill v. Workers' Comp. Appeal Bd. (News Corp., Ltd.)*, 29 A.3d 50, 58 (Pa. Cmwlth. 2011)).

3

16a-17a. He explained that, for the six or seven months before he stopped working, he was a final pipe and wire assembler, installing burners, plates, auto feed waters, gas trains, relief valves, conduit and vent pipes and running wiring by hand. *See* R.R. at 16a-17a. Claimant described that, during the preceding eight years, he worked for Employer in tubing, which was more physical, requiring him to install tubes, gauge, clamp and beat them, and cut and beat them again. *See* R.R. at 17a-18a. Claimant reported that the job required him to use air tools, including a 10 to 15-pound cutter and a 13 to 18-pound vibrating air ratchet to install approximately 200 tubes inside the larger boilers. *See* R.R. at 18a-19a.

Claimant recalled that, in 2014, while performing his tubing job, he began experiencing numbness, tingling and weakness in his wrists that worsened over time and caused him to lose sleep at night. *See* R.R. at 19a-20a. He was off work for five or six months, and he underwent left wrist carpal tunnel surgery on May 15, 2014 and right wrist carpal tunnel surgery on June 16, 2014, performed by Raymond Peart, M.D. (Dr. Peart). *See* R.R. at 20a-21a, 36a, 39a, 93a. Claimant articulated that although the surgeries alleviated the numbness and tingling, he still experienced weakness in both wrists. *See* R.R. at 21a-23a. He nevertheless returned to work beginning in August 2014, engaging in his full tubing duties, and he remained in that position for approximately one year. *See* R.R. at 21a-22a, 32a, 36a-38a. Claimant recounted that Employer's WC covered him for those injuries. *See* R.R. at 21a.

Claimant testified that, despite working his full-duty job, his wrists never fully strengthened, and he "transferred to pipe and wire, thinking it [would] be a little bit easier on [his] hands." R.R. at 23a; *see also* R.R. at 38a, 42a. However, he continued to have wrist weakness, numbness and tingling and, on January 12, 2016, he experienced tightening and severe pain in both wrists and elbows that caused him to drop brackets and wrenches. *See* R.R. at 24a-26a. Claimant notified Cross, who instructed Claimant to submit the Employee Injury/Illness Report Form and contact

4

human resources.  *See* R.R. at 26a-29a.  Thereafter, Claimant treated with Dr. Peart on January 20 and February 17, 2016 (who sent him for an EMG), he saw Dr. Becker on March 2, 2016, and then sought a second opinion from Sydney Jacoby, M.D. (Dr. Jacoby) on March 10, 2016, but thereafter treated solely with Dr. Becker.[7]  *See* R.R. at 28a-29a, 37a-40a.

Claimant explained that his wrist and elbow pain became so severe (left worse than right), that "[he] couldn't take it [any]more," and stopped working on March 8, 2016.  R.R. at 23a.  He described that Dr. Becker performed surgery on his left elbow on March 11, 2016 and his left wrist on May 6, 2016.  *See* R.R. at 29a-31a.  Claimant asserted that his left elbow surgery afforded him a lot of relief,[8] but his left wrist surgery did not.  *See* R.R. at 30a-31a.  At the hearing, Claimant reported that he was still dealing with pain and soreness in his right elbow and numbness, tingling and weakness in both wrists that caused him to drop things, for which he continued to treat with Dr. Becker.  *See* R.R. at 30a-32a.

Claimant stated that he did not do anything outside of work that caused him to constantly use his hands, wrists or arms.  *See* R.R. at 34a-35a, 46a.  He also disclosed that Dr. Becker prescribed Hydrocodone, Tramadol and Lorazepam, scheduled wrist and arm therapy beginning June 10, 2016 and discussed potential right elbow surgery.  *See* R.R. at 31a-32a, 45a-46a.  Claimant expressed that he is not capable of returning to his job because it is tough, physical work and he cannot hold anything heavy.  *See* R.R. at 32a-33a.

Claimant also presented Dr. Becker's deposition testimony, wherein Dr. Becker testified that his practice involves general orthopedic surgery and sports medicine, without specialization for any particular body part.  *See* R.R. at 71a.  Dr.

---

[7] Dr. Becker had treated Claimant in 2011 or 2012 for rotator cuff injuries sustained in a car accident.  *See* R.R. at 29a, 43a-44a, 71a.  Claimant visited Dr. Jacoby once.

[8] Claimant clarified that his left elbow is "still a little sore, but [he] could live with that."  R.R. at 30a.

5

Becker obtained Claimant's history regarding his bilateral carpal tunnel syndrome, Dr. Peart's treatments, and Claimant's April 18, 2014 and February 5, 2016 EMG results showing "improvement in [Claimant's] bilateral medial nerve function" after Dr. Peart's carpal tunnel releases. R.R. at 72a. Although Dr. Becker never discussed Claimant's work duties with Claimant, he read Claimant's testimony on the subject. *See* R.R. at 72a, 76a.

Dr. Becker's examination revealed that Claimant had bilateral subluxating ulnar nerves in his elbows, meaning they were not staying in their normal positions but were riding over the bones and causing irritation (left worse than right). *See* R.R. at 72a. Dr. Becker recommended and, on March 11, 2016, he performed ulnar nerve transposition to decrease Claimant's nerve movement and irritation "and hopefully decrease a lot of his symptoms . . . [from] what [Dr. Peart] called [scaphoid trapezial trapezoidal (STT) joint] arthritis, right above that area is where the whole nerve comes into the hand."[9] R.R. at 72a. Dr. Becker described that Claimant's left elbow symptoms improved after the March 11, 2016 surgery to the point that it is almost gone, but his left wrist symptoms did not improve.[10] *See* R.R. at 73a, 75a. On May 6, 2016, Dr. Becker performed another carpal tunnel release on Claimant's left wrist, and Claimant underwent physical therapy, but he still complained of heaviness, weakness and tingling in his left wrist. *See* R.R. at 73a, 77a. In order to determine other causes, Dr. Becker ordered a wrist MRI that showed only "a little bit of degenerative change[,]" including degeneration of Claimant's wrist cartilage. R.R. at 73a; *see also* R.R. at 77a. Dr. Becker opined that, since Claimant's wrists had not

---

[9] Dr. Becker recalled that, on March 10, 2016, Dr. Jacoby concurred with Dr. Becker's findings and recommendation regarding Claimant's elbow. *See* R.R. at 72a, 77a.

[10] In July 2016, Dr. Becker performed ulnar nerve transposition on Claimant's right elbow, the results of which were too soon to tell at the time of Dr. Becker's deposition. *See* R.R. at 74a-75a.

6

improved, Claimant had residual nerve damage from his carpal tunnel syndrome. *See* R.R. at 74a.

When Dr. Becker was asked whether Claimant's work duties caused Claimant's injuries, he responded that since it was an accepted work injury before Claimant treated with him, "[he was] not going to go back on" what was already established. R.R. at 74a. Dr. Becker also admitted that he was not aware that Dr. Peart released Claimant to full-duty work in September 2015 after the 2014 carpal tunnel surgeries, that Claimant did not treat for his hands again until January 2016 and, even then, Dr. Peart told Claimant he could continue his full-duty work. *See* R.R. at 76a. Dr. Becker acknowledged that Dr. Peart found Claimant demonstrated STT degeneration and "thought it might have been arthritis that was bothering [Claimant]," R.R. at 76a; *see also* R.R. at 77a. Dr. Becker further agreed that Dr. Jacoby suggested that Claimant likely had arthritis in his wrists. *See* R.R. at 77a. Dr. Becker testified that he assisted Claimant in obtaining short-term disability insurance, and Dr. Becker's bills have been paid by non-occupational health insurance. *See* R.R. at 76a-77a.

Cross testified for Employer that he has been Claimant's supervisor since 2014. He described that Claimant's tubing job involved Claimant working in two or three-man teams installing anywhere from 60 to 350 tubes in each boiler.[11] *See* R.R. at 111a. Cross stated that the job required the use of various hand tools for forming and sealing tubes inside the boiler (*i.e.*, a right angle gun) and a machine that accomplished the same task on the outside. *See* R.R. at 112a-113a. He recalled that since the interior boiler work was more challenging, the time the worker spent inside the boiler was limited to approximately two and one-half hours between breaks. *See* R.R. at 111a-113a. Cross calculated that the right angle gun, including its

---

[11] Cross explained that the tubes are made of carbon steel, could range from 2 inches to 22 feet in size, and may weigh from 8 to 30 pounds. *See* R.R. at 112a.

attachments, weighed approximately 20 pounds.  *See* R.R. at 113a.  He described that the right angle gun oscillated rather than vibrated, and the air hammer used for hand bolts had a more significant vibration, but the air hammer was used infrequently (*i.e.*, not on a daily basis and even then only for a couple of hours and only on boilers that required it).  *See* R.R. at 113a-114a.

Cross agreed that the tubing job was physically demanding and repetitive: "[I]t's the same task that's just performed over and over.  There's not a break . . . other than the different aspects of the tubing of the boiler, so what you're doing to one tube you do to the next tube and the next tube and the next tube."  R.R. at 115a; *see also* R.R. at 114a.  Cross recounted that Claimant progressively returned to his tubing job in August 2014, beginning with two hours per day and, over time, built up to full-time hours.  *See* R.R. at 110a, 131a-132a.  He recalled Claimant complaining of wrist soreness and Claimant communicating that his condition was not getting better.  *See* R.R. at 117a.

Cross discussed with Claimant, and in July 2015 Claimant accepted, a pipe and wire position that was less demanding and was more physically diverse from hour-to-hour and day-to-day.  *See* R.R. at 115a-118a.  Cross explained that the pipe and wire job consisted of one or two-man teams creating a sub-assembly of piping that workers install on the boilers with electrical conduit and a panel (for those boilers that have them) and running the wiring to its location.  *See* R.R. at 120a-122a.  He testified that pipe and wire on a simple boiler could take one man one day or one and one-half days to complete, while a more complex boiler would require a two-man team four to five days to finish.  *See* R.R. at 122a-123a.  Of the numerous tools Cross listed that Claimant used to perform the pipe and wire job, only the metal grinder vibrated, and Cross estimated that Claimant would have used it less than 5% of the time.  *See* R.R. at 123a-124a.

8

Cross agreed that both tubing and pipe and wire jobs require Claimant to use his hands throughout the shift for turning, twisting, gripping and pinching, and to use power tools. *See* R.R. at 130a, 138a. He estimated that tubing requires tools for 80% of the work, while pipe and wire only requires tools for 20% of the job. *See* R.R. at 131a. Cross clarified that the crimper used in the pipe and wire job requires only minimal grip because the wire is thin-gauged and, even when there's thicker wire involved, "it should be like . . . a hand shake." R.R. at 139a. Cross articulated that he never observed Claimant drop tools, nor was he ever told by Claimant or his co-workers that it occurred. *See* R.R. at 125a. Rather, when he observed Claimant working, Claimant "could do the work and he turned out good work." R.R. at 125a.

Cross confirmed that, "[i]n January [] 2016, [Claimant] approached [him] and said that he couldn't take it anymore and that he needed to have [his wrists and elbows] looked at" because "he had reached a point where it was unbearable to him anymore." R.R. at 125a; *see also* R.R. at 132a. Cross completed the Employee Injury/Illness Report Form. *See* R.R. at 132a-133a. Cross testified that even after Claimant sought medical treatment in January 2016, he continued to do his full-duty work without restrictions and did not appear to have any problems, and Cross did not observe or hear that Claimant was dropping tools. *See* R.R. at 126a. Cross declared that Claimant did not ask for time off due to his wrists and elbows between August 2014 and January 2016, and he only missed typical time from work for vacation or call-in days. *See* R.R. at 133a, 140a-141a.

Cross stated that he reviewed the work-risk analysis prepared in connection with Claimant's medical treatment and concluded that it focused on Claimant's ability to control his body and hand positions and did not suggest any across-the-board process or procedure changes to Claimant's job. *See* R.R. at 126a-127a. Cross explained that Claimant has been out of work on medical leave since

9

March 2016, and that Claimant's job was to be held open until March 2018. *See* R.R. at 127a-128a.

Employer also presented the deposition testimony of Dr. Kirkpatrick, an orthopedic surgeon who specializes in hands and upper extremities and who conducted an independent medical evaluation (IME) of Claimant on July 18, 2016 at Employer's request. Dr. Kirkpatrick testified that he reviewed Claimant's medical history, including his medical records and 2014 and 2016 EMG tests, considered Claimant's job history and duties, and also examined Claimant. *See* R.R. at 92a-93a. Dr. Kirkpatrick recollected that Claimant's 2014 EMG indicated the presence of severe bilateral carpal tunnel syndrome that was alleviated by Dr. Peart's 2014 surgeries and Claimant returned to his tubing work without restriction. *See* R.R. at 93a. He further recalled Dr. Becker's surgical intervention and that the studies Dr. Peart performed in early 2016 "demonstrated the presence of arthritis in the wrist" for which Claimant was given a steroid injection "that did not really help." *See* R.R. at 93a.

During the IME, Claimant told Dr. Kirkpatrick that he had right elbow pain, continued to have wrist pain and numbness - on the left more than the right - and experienced hand weakness that caused him to drop things. *See* R.R. at 93a. On examination, Dr. Kirkpatrick observed that Claimant had full range of motion in his elbows, wrists and fingers, and did not have finger numbness or tingling. *See* R.R. at 94a. Dr. Kirkpatrick reported Claimant's tenderness on palpation of both medial elbows, and pain and discomfort in his volar wrists and tenderness primarily over his STT joints of both wrists. *See* R.R. at 93a. Dr. Kirkpatrick explained that "[t]he STT joints of the wrists are a very common site for osteoarthritis. And the significance is that this is indicating the presence of likely an osteoarthritis in the wrist joints." R.R. at 93a. Otherwise, Dr. Kirkpatrick noted that Claimant's grip strength was "essentially equal in both hands." R.R. at 94a.

10

Dr. Kirkpatrick diagnosed that Claimant had bilateral volar wrist pain with probable osteoarthritis and right medial elbow pain complaints. *See* R.R. at 94a. Dr. Kirkpatrick concluded:

> I did not identify any specific work injury that this patient may have sustained to either hand or upper extremity. I noted that for one thing, he had been out of work for over four months and yet he said he had no change in his symptomatology. I did note that he continued to have complaints over both volar wrists. He had an appropriate surgery for his carpal tunnel release on both sides. He did not, at the time that I saw him, have any evidence of any ongoing [carpal tunnel syndrome] on either side.
>
> . . . .
>
> He, in fact, clearly said that he didn't have any numbness or tingling in any of the fingers, which, therefore, indicates the absence of any ongoing carpal tunnel syndrome. So, therefore, I didn't see the need for any further surgery for the median nerves. I also was aware that Dr. Peart . . . identified osteoarthritis in the left wrist. He had been symptomatic over the area of the STT joint region with Dr. Peart, as he was for me.
>
> I felt that a good deal of his symptomatology was related to this underlying osteoarthritis. The likelihood is that he had the same findings in the right wrist. I did not feel that his osteoarthritis, however, was in any way related to a work injury or a work concern.

R.R. at 94a.

Specifically regarding Claimant's job duties, Dr. Kirkpatrick stated when evaluating whether work tasks are implicated in a patient's medical complaints, he looks at activity variety, repetition, force, vibration and extremity posturing. Dr. Kirkpatrick evaluated the purported repetition Claimant's job involved, and explained that "repetitiveness has to be pathologic in order to lead to any work-related conditions. Meaning that somebody using repetitive, forceful grasping, such as with a meat cutter, cutting half frozen carcasses eight hours a day may develop pathologic

11

conditions doing that particular activity." R.R. at 97a. He recalled: "I believe that [Claimant] was only using a grinder for a very short period of time during his work time." R.R. at 97a. He ultimately opined:

> Q. So putting all of this together with the job description and what [Claimant] told you about his position, do you feel that his work activities contributed in any material or significant way to the complaints and problems that he's having?
>
> A. No, I do not.
>
> Q. Does the fact that his complaints and problems persisted despite an absence from work for a period of months, does that affect your opinion in any way?
>
> A. Yes. That would be another factor that would be considered, the continuation of symptoms after stopping work activities. One would reasonably expect that if the work activities were materially contributing to the symptomatology, that by stopping, one should see, at least, an abatement . . . or resolution of the symptoms, and that did not occur here.
>
> Q. Is that by history that he told you his symptoms had gotten no better?
>
> A. Yes.

R.R. at 97a. Dr. Kirkpatrick stated that, based upon his objective findings and in the absence of a work injury, he would not place any restrictions on Claimant's ability to work. *See* R.R. at 94a.

This Court must determine whether the WCJ's factual findings are supported by substantial evidence. *Stepp v. Workers' Comp. Appeal Bd. (FairPoint Commc'ns, Inc.)*, 99 A.3d 598 (Pa. Cmwlth. 2014). "Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Washington v. Workers' Comp. Appeal Bd. (State Police)*, 11 A.3d 48, 54 n.4 (Pa. Cmwlth. 2011) (quotation marks omitted). Further, the law is well-

12

established that "[t]he WCJ is the ultimate factfinder and has exclusive province over questions of credibility and evidentiary weight." *Univ. of Pa. v. Workers' Comp. Appeal Bd. (Hicks)*, 16 A.3d 1225, 1229 n.8 (Pa. Cmwlth. 2011). "The WCJ, therefore, is free to accept or reject, in whole or in part, the testimony of any witness, including medical witnesses." *Griffiths v. Workers' Comp. Appeal Bd. (Red Lobster)*, 760 A.2d 72, 76 (Pa. Cmwlth. 2000).

Based upon the evidence presented in the instant case, the WCJ denied the Claim Petition because "Claimant has not met his burden of proving that he sustained work-related bilateral wrist injuries as of March 8, 2016, and accordingly is entitled to neither wage loss nor medical benefits for such injuries." WCJ Dec. at 9; R.R. at 206a. In reaching his decision, the WCJ made the following credibility determinations:

> 32. The opinions of Dr. Becker are not credible, as he was fundamentally unaware of Claimant's history, relied on misinformation, and performed no diagnostic studies.
>
> 33. This [WCJ] finds as fact, based on the competent and credible evidence of record, that Claimant is not entitled to [WC] benefits for bilateral wrist complaints from March 2016 and ongoing, as such complaints are not related to any work injury.
>
> 34. The credible testimony presented in this case supports a finding that Claimant suffers from non-work related degenerative joint disease of the wrists. Treatment provided to Claimant has properly proceeded through non-occupational channels and he has been compensated for time away from work through short[-]term disability.
>
> 35. Further, this [WCJ] finds as fact that there is no evidence that Claimant suffers from residual symptomology related to his 2014 carpal tunnel injuries, as Claimant returned to work full[-]duty and was released from care in September 2015, four months before his arthritic pain surfaced. In so ruling, this [WCJ] notes that Claimant acknowledged that the numbness and tingling in his hands

13

abated after his 2014 surgeries and that in January 2016, severe pain 'came out of nowhere.'

36. In ruling as indicated above, this [WCJ] finds the testimony of Dr. Kirkpatrick and [Cross] to be credible and persuasive and consistent with the background medical evidence. Although Claimant is generally credible, where his testimony conflicts with the opinions of Dr. Kirkpatrick or the lay testimony of [Cross], it is found to be neither credible nor persuasive as it is not supported by the background medical evidence.

WCJ Dec. at 9; R.R. at 206a. On appeal, the Board agreed, concluding that "the credible testimony of [Cross] and particularly Dr. Kirkpatrick is substantial, competent evidence which supports the WCJ's findings that Claimant's symptoms in 2016 were attributable to non-work-related degenerative joint disease of the wrists and not his 2014 carpal tunnel injuries." Board Dec. at 11; R.R. at 224a.

Neither the Board nor the Court may reweigh the evidence or the WCJ's credibility determinations. *Sell v. Workers' Comp. Appeal Bd. (LNP Eng'g)*, 771 A.2d 1246 (Pa. 2001). Specifically, "Section 422(a) [of the Act, 77 P.S. § 834,] does not permit a party to challenge or second-guess the WCJ's reasons for credibility determinations. [Thus, u]nless made arbitrarily or capriciously, a WCJ's credibility determinations will be upheld on appeal."[12] *Pa. Uninsured Emp'rs Guar. Fund v. Workers' Comp. Appeal Bd. (Lyle)*, 91 A.3d 297, 303 (Pa. Cmwlth. 2014) (quoting *Dorsey v. Workers' Comp. Appeal Bd. (Crossing Constr. Co.)*, 893 A.2d 191, 195 (Pa. Cmwlth. 2006)). Finally, this Court has held:

'In performing a substantial evidence analysis, this [C]ourt must view the evidence in a light most favorable to the party who prevailed before the factfinder.' 'Moreover, we

---

[12] Capricious disregard "occurs only when the fact-finder deliberately ignores relevant, competent evidence." *Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 145 (Pa. Cmwlth. 2004). Capricious disregard, by definition, does not exist where, as here, the WCJ expressly considered and rejected the evidence. *Williams*.

14

are to draw all reasonable inferences which are deducible from the evidence in support of the factfinder's decision in favor of that prevailing party.' It does not matter if there is evidence in the record supporting findings contrary to those made by the WCJ; the pertinent inquiry is whether the evidence supports the WCJ's findings.

*3D Trucking Co., Inc. v. Workers' Comp. Appeal Bd. (Fine & Anthony Holdings Int'l)*, 921 A.2d 1281, 1288 (Pa. Cmwlth. 2007) (quoting *Waldameer Park, Inc. v. Workers' Comp. Appeal Bd. (Morrison)*, 819 A.2d 164, 168 (Pa. Cmwlth. 2003)) (citations omitted).

Here, the WCJ summarized all of the testimony and adequately explained his credibility determinations. Because this Court may not reweigh the evidence or the WCJ's credibility determinations, and must view the evidence in a light most favorable to Employer, after a thorough review of the record, we agree that Claimant failed to prove the elements necessary to support his Claim Petition. Thus, the WCJ properly granted the Claim Petition. Accordingly, the Board did not err by affirming the WCJ's decision denying Claimant's Claim Petition.

Claimant also asserts that the Board erred by affirming the WCJ's decision denying the Motion. "It is well settled that the admission of evidence is within the sound discretion of the WCJ." *Washington*, 11 A.3d at 59. "[A] WCJ's determination regarding the admission of evidence will not be overturned without a showing of an abuse of that discretion." *Id.* Specifically, a WCJ's refusal to reopen the record will not be reversed absent an abuse of discretion. *See Hammerle v. Workmen's Comp. Appeal Bd. (Dep't of Agric.)*, 490 A.2d 494 (Pa. Cmwlth. 1985). "An abuse of discretion occurs where the WCJ's judgment is manifestly unreasonable, where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Allegis Grp. & Broadspire v. Workers' Comp. Appeal Bd. (Coughenaur)*, 7 A.3d 325, 327 n.3 (Pa. Cmwlth. 2010).

Here, on or about December 31, 2016, long after the record was closed (on or about October 29, 2016) and several weeks after the parties' briefs were filed, Claimant's counsel filed the Motion seeking to have the record reopened for Claimant to submit documentation of his 2014 bilateral wrist injury claim, to further cross-examine Dr. Kirkpatrick and to re-depose Dr. Becker. *See* R.R. at 143a-144a, 192a-197a; *see also* WCJ Dec. at 3 (R.R. at 200a); Supplemental Reproduced Record (S.R.R.) at 35b-36b.

> In rejecting Claimant's Motion, the WCJ stated:
>
> The basis for the Motion was the assertion of Claimant's counsel that he was unaware [Employer] had issued a Notice of Compensation Payable recognizing Claimant's work-related bilateral carpal tunnel surgeries in 2014 until after the record closed.
>
> At a hearing on June 9, 2016, [Claimant] testified as follows on direct examination:
>
> Q. You treated with Dr. Peart; is that correct?
>
> A. Yes.
>
> Q. And looking at the medical records, he did surgery to both your right and left wrists; is that correct?
>
> A. Yes.
>
> Q. Left wrist was May 15, 2014; does that sound right?
>
> A. Yes.
>
> Q. Right wrist was June 16, 2014; does that sound right?
>
> A. Yes.
>
> Q. Well, let me ask you this, was this paid for by [WC]?
>
> A. Yes.
>
> It is evident from this testimony that Claimant's counsel could easily have ascertained, long before the close of the record, either from his client, or from a properly[-]drafted

16

> subpoena to the Bureau of [WC] that [Employer] had recognized the 2014 carpal tunnel surgeries as work-related. The [Motion] is therefore denied.

WCJ Dec. at 3 (R.R. at 200a).

Discerning no error in the WCJ's reasoning, this Court holds that the WCJ did not abuse his discretion by declining to reopen the record. Because the WCJ did not abuse his discretion, the Board properly affirmed the WCJ's decision denying Claimant's Motion.

For all of the above reasons, the Board's order is affirmed.


_____
ANNE E. COVEY, Judge


Judge Fizzano Cannon did not participate in the decision in this case.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Orlando Burgos,      :
     Petitioner  :
           :
    v.      :
           :
Workers' Compensation Appeal :
Board (Burnham, LLC),   :  No. 852 C.D. 2018
     Respondent :

## O R D E R

AND NOW, this 8th day of February, 2019, the Workers' Compensation Appeal Board's May 22, 2018 order is affirmed.

_____
ANNE E. COVEY, Judge