# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Armstrong Kover Kwick, Inc. :
and UPMC Benefit Management :
Services, Inc., :
                Petitioners :
              :
        v. : No. 434 C.D. 2019
         : Submitted: August 2, 2019
Workers' Compensation Appeal :
Board (Michel), :
            Respondent :

BEFORE:  HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE P. KEVIN BROBSON, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**          **FILED: January 9, 2020**

Petitioners Armstrong Kover Kwick, Inc. and UPMC Benefit Management Services, Inc. (collectively, Employer) petition for review of an order of the Workers' Compensation Appeal Board (Board), dated March 19, 2019. The Board affirmed an order of a Workers' Compensation Judge (WCJ), which granted Tracy Michel's (Claimant) Claim Petition.[1] For the reasons set forth below, we affirm in part and reverse in part.

---

[1] The WCJ also denied Employer's Termination Petition. Employer's Termination Petition is not relevant to this appeal and, therefore, we do not address it in this opinion.

# I. BACKGROUND

On September 1, 2015, Claimant sustained an injury to her left foot while working in Employer's warehouse. Employer accepted liability for a left foot strain pursuant to a medical-only Notice of Temporary Compensation Payable, which subsequently converted to a medical-only Notice of Compensation Payable by operation of law. On March 8, 2016, Claimant filed a Claim Petition, seeking disability benefits beginning October 26, 2015, and ongoing as a result of her work-related injury. Employer filed an answer, admitting that Claimant suffered a left foot strain on September 1, 2015, but denying all other material allegations.

Before the WCJ, Claimant testified that she worked for Employer as a production coordinator. (Reproduced Record (R.R.) at 52a.) In that position, Claimant was responsible for maintaining stock, overseeing employees to ensure workflow, and assisting with packaging and delivering. (*Id.*) She testified that during a typical day, she was constantly on her feet in Employer's warehouse and sat at her desk only twenty to twenty-five percent of the time. (*Id.* at 52a-54a.) In June 2015, Claimant was counting inventory in Employer's warehouse when her left foot slid off the rung of a ladder, causing her to experience immediate pain in her left foot. (*Id.* at 54a.) Claimant testified that, following the incident, she filled out an accident report and gave it to Linda Simon, one of Employer's owners, who advised her to wait a few days to see if the pain would resolve on its own. (*Id.* at 54a-55a.) The pain did not resolve, and Claimant sought treatment at a Concentra urgent care facility (Concentra) a few days later. (*Id.*) Concentra's medical professionals released Claimant to return to work without restrictions. (*Id.* at 55a.) Employer did not open a formal workers' compensation claim for this June 2015 work-related incident. (*Id.* at 55a-56a.)

Claimant testified further that on September 1, 2015, she stretched to stop a large cabinet from tipping over in Employer's warehouse when she experienced intense pain in her left foot. (*Id.* at 56a-57a.) Claimant immediately filled out an incident report and sought treatment at Concentra that same day. (*Id.* at 57a.) The following day, Claimant underwent a magnetic resonance imaging test (MRI) but continued to work. (*Id.* at 57a-58a.) Thereafter, on October 16, 2015, Claimant gave Employer her two-weeks' notice. (*Id.* at 58a.) She explained that her primary reasons for doing so were the pain that she was experiencing in her left foot and the fact that Employer was not accommodating her injury. (*Id.*) Her secondary reason was her work environment. (*Id.*) Claimant explained that Ken Simon, Employer's other owner, constantly berated her in front of her colleagues, and Ms. Simon threatened to demote her to a warehouse worker if she continued to get hurt in the warehouse. (*Id.* at 58a-59a.)

Claimant also testified that she continued to receive treatment at Concentra for her September 1, 2015 work-related injury and was eventually referred to Aaron Mares, M.D., at University of Pittsburgh Medical Center. (*Id.* at 64a.) Dr. Mares treated Claimant on October 26, 2015, at which time Dr. Mares imposed a no-work restriction for one week. (*Id.* at 64a-65a.) Because Claimant had already provided Employer with her two-weeks' notice, however, Claimant returned to work on October 27, 2015, to collect her things and ceased working for Employer that same day. (*Id.* at 65a-66a.) Claimant's intense foot pain continued, and she began receiving treatment from MaCalus V. Hogan, M.D., who performed surgery on her left foot on January 22, 2016. (*Id.* at 66a.) Claimant stated that the surgery was not helpful, and she continues to suffer from swelling, fluid retention,

3

difficulty with bearing weight, stabbing and burning pain, color changes, differences in temperature, and numbness in her left foot. (*Id.* at 68a.)

Claimant also presented the deposition testimony of Dr. Hogan, who is a board-certified orthopedic surgeon and fellowship-trained orthopedic foot and ankle specialist. (*Id.* at 314a.) Dr. Hogan first treated Claimant on December 14, 2015. (*Id.* at 317a.) At that time, Dr. Hogan performed a physical examination, which revealed swelling over the lateral outside aspect of Claimant's left foot and limited range of motion. (*Id.* at 321a-22a.) Dr. Hogan also obtained a history and reviewed the results from an MRI performed on November 12, 2015. (*Id.* at 318a, 321a-22a.) Based on Claimant's history, his physical examination, and his review of Claimant's diagnostic studies, Dr. Hogan diagnosed Claimant with os peroneum syndrome and a peroneal tendon injury, which he opined were caused by the September 1, 2015 work-related incident. (*Id.* at 323a-24a, 328a.) On January 22, 2016, Dr. Hogan performed surgery to repair Claimant's peroneal tendon injury. (*Id.* at 324a-25a.) Dr. Hogan indicated that he was able to confirm his initial diagnosis with his surgical findings. (*Id.* at 328a.)

Dr. Hogan testified that two or three months after he performed the surgery, he became concerned that Claimant had developed Complex Regional Pain Syndrome (CRPS) due to her complaints of decreased sensation over and around the areas of her incision and left leg, combined with hypersensitivity in other areas. (*Id.* at 333a-34a.) While he believed in his mind that Claimant had developed post-operative CRPS and that he was qualified to form that diagnosis, he referred Claimant to a pain management specialist to confirm his diagnosis and to provide appropriate treatment. (*Id.* at 334a-35a, 338a.)

Dr. Hogan stated that he treated Claimant again on December 23, 2016, eleven months post-surgery. (*Id.* at 340a.) At that time, Claimant's left leg was still in a boot, and Dr. Hogan noted visible color change, or asymmetry, of Claimant's extremities at the surgical site. (*Id.* at 338a-39a.) Dr. Hogan also reviewed the results of a quantitative sudomotor axon reflex test (QSART test) performed on September 13, 2016, which he indicated revealed abnormal findings. (*Id.* at 336a-37a.) Dr. Hogan explained that his physical findings, Claimant's symptoms, and Claimant's diagnostic test results are all consistent with a diagnosis of CRPS. (*Id.* at 337a-41a.) At the time of his December 23, 2016 examination, Dr. Hogan released Claimant to return to sedentary-duty work with occasional breaks for the first time since surgery. (*Id.* at 340a-41a.) He specified, however, that in any sedentary position, Claimant would need to be able to sit seventy-five to eighty percent of the time, and that she could not perform a job that required her to be on her feet fifty percent of the time. (*Id.* at 341a-42a.) As of the date of his deposition, Claimant remained under Dr. Hogan's care. (*Id.* at 343a.)

Claimant also presented the deposition testimony of Maureen Murphy-Ginsburg, D.O., who is board certified in physical medicine and rehabilitation, with a specialty in pain management. (*Id.* at 258a.) Dr. Ginsburg explained that she began treating Claimant in 2013 for right hip problems that were unrelated to the work injury. (*Id.* at 261a.) Dr. Ginsburg explained further that, following Claimant's September 1, 2015 work injury and Dr. Hogan's subsequent surgery, Alan Chu, M.D., referred Claimant to Dr. Ginsburg for pain management with respect to her left foot.[2] (*Id.* at 262a.) Dr. Ginsburg first treated Claimant for

---

[2] Claimant initially received treatment from Dr. Chu, who diagnosed her with CRPS and initiated some treatments for pain management. (R.R. at 262a.) Because Dr. Ginsburg was

her work-related left foot injury on May 3, 2016. (*Id.*) In the three years prior to May 3, 2016, when Dr. Ginsburg treated Claimant for her right hip, Claimant never complained of left foot problems. (*Id.* at 261a.) At the time of the May 3, 2016 visit, Claimant presented with "crushing, spearing, shooting, [and] burning pain" in her left foot. (*Id.* at 262a-63a.) Based on Claimant's history, Dr. Chu's office notes, and her physical examination, Dr. Ginsburg diagnosed Claimant with CRPS of the left lower extremity. (*Id.* at 267a, 295a.) Dr. Ginsburg described CRPS as occurring "after an injury or trauma to an extremity where instead of progressing and healing, pain improving, symptoms improving, and the overall trauma resolving, people tend to go backwards where they note more severe pain that may be different than what they had initially, but more of a neuropathic or a nerve-type complaint, but their pain may be more severe than it was initially." (*Id.* at 268a.) Dr. Ginsburg identified the trauma that caused Claimant's CRPS as the September 1, 2015 work injury. (*Id.* at 275a.) Dr. Ginsburg also explained that the abnormal results from Claimant's QSART test further confirmed her diagnosis of CRPS. (*Id.* at 272a-73a.) As of the date of her deposition, Dr. Ginsburg opined that Claimant had not fully recovered from her CRPS and likely never would. (*Id.* at 275a.)

On cross-examination, Employer's counsel questioned Dr. Ginsburg about a medical note that she authored on June 23, 2015, while treating Claimant for her right hip problems. (*Id.* at 279a-80a.) Dr. Ginsburg acknowledged that, under the "new problems" section of her note, it stated "three weeks ago patient noted onset of pain in the left lateral foot/ankle, denies injury, trauma." (*Id.* at 280a, 308a.) Dr. Ginsburg explained, however, that she commented on this symptom because

---

familiar with Claimant from previous pain complaints relating to her right hip, however, Dr. Chu referred Claimant to Dr. Ginsburg to continue all pain management. (*Id.*)

6

pain in Claimant's left lower extremity could have affected Claimant's gait, which, in turn, could have made Claimant's right hip symptoms worse. (*Id.* at 280.) Dr. Ginsburg, therefore, suggested that Claimant apply ice and wrap her left foot, but she did not institute any work restrictions. (*Id.* at 280a-81a.)

Claimant also presented the deposition testimony of Gregory Flinn Habib, D.O., a board-certified orthopedic surgeon. (*Id.* at 438a.) Dr. Habib first treated Claimant on December 19, 2016. (*Id.* at 456a.) At that time, Dr. Habib performed a physical examination, which revealed a nerve issue at the peroneal nerve and discoloration in Claimant's left foot, when compared to her right foot. (*Id.* at 457a-59a.) Based on his physical examination, his review of Claimant's medical records, and his review of Claimant's diagnostic test results, Dr. Habib indicated that Claimant had a time of injury diagnosis of peroneus longus tendinitis with os peroneum syndrome and a current diagnosis of post-surgical CRPS of the left lower extremity. (*Id.* at 461a.) Dr. Habib indicated that he based his CRPS diagnosis on his review of several diagnostic tests, including a triple phase bone scan performed on December 28, 2016, an MRI performed on February 4, 2017, and a QSART test performed on September 13, 2016. (*Id.* at 463a-67a). Dr. Habib testified that each of the diagnostic test results was consistent with Claimant's symptoms and complaints and supported his CRPS diagnosis. (*Id.*) Dr. Habib opined that the September 1, 2015 work injury and subsequent surgery directly caused Claimant's condition. (*Id.* at 468a-70a.) In terms of work restrictions, Dr. Habib testified that Claimant was a candidate for sedentary work, with very limited periods of standing. (*Id.* at 461-62a.) When asked about Dr. Ginsburg's June 23, 2015 office note, Dr. Habib stated that "it seems like something occurred in early June – but she was released back to full work duty." (*Id.* at 472a.) Dr. Habib

explained, however, that Dr. Ginsburg's office note did not change his opinion regarding the etiology of Claimant's condition. (*Id.* at 472a-73a.)

Employer presented the deposition testimony of Jeffrey N. Kann, M.D., who is board certified in orthopedic surgery and specializes in lower extremity orthopedics. (*Id.* at 538a-39a.) Dr. Kann performed an independent medical examination of Claimant on July 21, 2016, which included obtaining a history, performing a physical examination, and reviewing Claimant's medical records. (*Id.* at 540a-46a.) Based on his physical examination of Claimant, Dr. Kann opined that Claimant did not suffer from CRPS. (*Id.* at 546a-47a.) Dr. Kann explained that, during his physical examination, he found no evidence of skin changes, hair pattern changes, or toenail pattern changes, which he attested are hallmarks of CRPS. (*Id.* at 544a-45a.) Dr. Kann also indicated that he took x-rays of Claimant's left foot, which showed no indication of CRPS. (*Id.* at 546a-47a.)

In reviewing Claimant's medical records, Dr. Kann agreed that Claimant suffered an os peroneum injury that required surgery. (*Id.* at 547a.) He disagreed, however, that the September 1, 2015 incident caused such injury. (*Id.* at 556a-58a.) Relying on Dr. Ginsburg's June 23, 2015 office note, Dr. Kann concluded "without question" that Claimant complained of left lateral foot pain at some point in late May or early June 2015 that was not related to any work incident or trauma. (*Id.* at 557a-58a.) Dr. Kann explained that some unknown event, not the September 1, 2015 work incident, caused Claimant to require surgery by Dr. Hogan. (*Id.*) Dr. Kann ultimately concluded that Claimant had fully recovered from both the initial injury and Dr. Hogan's surgery. (*Id.* at 547a.)

Employer also presented the testimony of Ms. Simon, Employer's executive vice president and part owner. (*Id.* at 92a.) Ms. Simon testified that, in

her role as executive vice president, she handles human resources matters, including resolving personnel issues and processing workers' compensation claims. (*Id.* at 92a-93a.) During Claimant's tenure with Employer, several human resources-related incidents involving Claimant were reported to Ms. Simon. (*Id.* at 94a-96a.) Ms. Simon indicated that some of these incidents occurred between Claimant and Mr. Simon. (*Id.* at 96a.) On three or four occasions, Mr. Simon raised his voice to Claimant and used inappropriate language when voicing frustration. (*Id.*) On one of those occasions, Ms. Simon specifically went to Claimant and apologized for her husband's behavior. (*Id.*)

Regarding Claimant's injuries, Ms. Simon testified that she received either an email or call from Claimant on July 21, 2015, reporting that she injured her left foot at work. (*Id.* at 99a-100a.) When Ms. Simon arrived at work the following day, an incident report, completed by Claimant, was on her desk. (*Id.*) Following the injury, Claimant continued to work for Employer, and Ms. Simon observed Claimant "hobbling maybe a little bit," but Ms. Simon "wasn't too concerned." (*Id.* at 100a.) Ms. Simon indicated that Claimant did not ask for any type of accommodation or provide a medical note requiring an accommodation following the July 21, 2015 incident. (*Id.*) On September 1, 2015, Claimant notified Ms. Simon by email that she had reinjured her left foot and that she was going directly to Concentra for treatment. (*Id.*) After the September 1, 2015 work incident, Claimant returned to her normal job, did not ask for any type of accommodation, and did not provide a medical note requiring an accommodation. (*Id.* at 100a-01a.)

When questioned about whether she threatened to demote Claimant if Claimant sustained another injury in Employer's warehouse, Ms. Simon explained that Claimant is categorized as an administrative employee under Employer's

workers' compensation insurance policy, and, after the second work-related incident, Employer's workers' compensation insurer contacted Ms. Simon to question why an administrative employee had been injured twice in the warehouse. (*Id.* at 101a.) Following this conversation, Ms. Simon alerted Claimant that Employer's workers' compensation insurer was asking questions and advised her to be more careful. (*Id.* at 102a.) Ms. Simon denied threatening to demote Claimant as a result of her work injury. (*Id.*)

Ms. Simon stated further that, because of its small size, Employer did not have a formal modified-duty work program. (*Id.* at 109a.) Employer had, however, offered modified-duty work to employees in the past. (*Id.* at 110a-13a.) Ms. Simon recounted an occasion where an employee suffered a leg injury and was permitted to perform her job, which typically required prolonged standing, while sitting on a stool. (*Id.* at 111a.)

Ms. Simon also testified that, at some point in October 2015, she was made aware that Claimant had resigned. (*Id.* at 102a.) Ms. Simon explained that she spoke to Claimant after hearing this news, and Claimant stated "I'm sorry, Linda, I just couldn't take the pressure anymore." (*Id.* at 104a.) According to Ms. Simon, Claimant never expressed any concern that she could not do her job because of her foot injury or that she was resigning based on Employer's failure to accommodate her work-related injury. (*Id.* at 104a-05a.)

Employer also presented the testimony of David Shearer, Employer's Roll Department Manager and Claimant's direct supervisor. (*Id.* at 142a.) Mr. Shearer testified that Employer hired Claimant to take over several of his job responsibilities. (*Id.* at 142a-43a.) He estimated that Claimant spent about fifty percent of the workday on her feet in the warehouse. (*Id.* at 143a.) Mr. Shearer

indicated that he was aware that Claimant sustained injuries to her left foot in both June and September of 2015, but, despite these injuries, Claimant continued to perform her job without issue. (*Id.* at 145a.) Thereafter, on October 16, 2015, Claimant advised Mr. Shearer by text message that she was resigning. (*Id.* at 148a.) Mr. Shearer explained that he was not in the office that day but had been in virtual communication with Claimant regarding an incorrect order. (*Id.*) Toward the end of that text message conversation, Claimant stated to Mr. Shearer: "I don't think I'm right for this job. I think you can find someone better, and I don't think I can do this anymore." (*Id.*) Mr. Shearer indicated that Claimant left the office early that day but returned the following Monday as a courtesy to Employer to finish out her final two weeks of work. (*Id.* at 149a-50a.) Mr. Shearer explained that the two-week period was ultimately cut short, however, when Claimant presented him with a doctor's note on October 26, 2015, restricting her from being on her feet. (*Id.* at 150a-51a.) Mr. Shearer advised Claimant to follow her doctor's orders, and Claimant stopped working for Employer that same day. (*Id.* at 151a.) When questioned about whether Employer could have made modifications to allow Claimant to continue to work her pre-injury job, Mr. Shearer testified that Employer had accommodated his needs in the past and had allowed him to work from home in order to care for his children. (*Id.* at 152a-53a.)

Mr. Shearer also explained a text message that he sent to Claimant months earlier regarding a different order that Claimant had placed incorrectly. (*Id.* at 176a.) In that text message, Mr. Shearer indicated that he was going to "throat punch" Claimant. (*Id.* at 176a; Certified Record (C.R.), Ex. 22.) In hindsight, Mr. Shearer realized the text message was inappropriate, and, although he was upset, he never intended to threaten Claimant with violence. (R.R. at 155a, 177a.)

11

On October 10, 2017, the WCJ issued a decision granting Claimant's Claim Petition. In so doing, the WCJ made the following relevant factual findings:

> 21. Claimant suffered a [sic] work-related os perineum [sic] syndrome and a peroneal tendon injury on September 1, 2015 that led to Dr. Hogan's surgery, after which Claimant developed work-related CRPS.
>
> . . . .
>
> 22. Claimant's resignation from Employer was unconnected to her work injury.
>
> . . . .
>
> 23. As of October 26, 2015, Claimant was disabled from the pre-injury job from which she resigned, and this disability continues.
>
> . . . .
>
> 24. Claimant has not fully recovered from her September 1, 2015 work-related injury.

(WCJ's Decision at 13-15.) In making these findings, the WCJ credited Claimant's testimony regarding the occurrence of the September 1, 2015 work-related injury, noting that Employer did not challenge the injury but, rather, acknowledged it with the converted medical-only Notice of Compensation Payable. The WCJ also found significant that Claimant reported the injury and sought medical treatment that same day. With respect to the expert medical testimony, the WCJ credited the opinions of Drs. Hogan, Ginsburg, and Habib over those of Dr. Kann. The WCJ reasoned that Claimant's treating physicians were in a better position to assess Claimant's condition over time. The WCJ also noted that Dr. Kann merely disagreed with Dr. Hogan's etiology regarding Claimant's os peroneum syndrome diagnosis, not the actual diagnosis. In addressing the purported inconsistency posed by Dr. Ginsburg's medical records, the WCJ stated:

> I appreciate the fact that Dr. Ginsburg's June 23, 2015 note certainly suggest[s] that Claimant's left foot

12

problems pre-dated the claimed June or July 2015 and September 1, 2015 work injuries. However, I do not consider this to be the "smoking gun" that Employer makes it out to be. Of note, regardless of whether these complaints were pre-existent to the June/July work event, or the result of it, the fact remains that Claimant continued to work her full-duty job and was released to unrestricted work as of the end of July of 2015, per the Concentra note. As cogently explained in Dr. Habib's credible testimony, it was the September 1, 2015 incident that truly began the cascade of medical problems that befell Claimant, and I consider that event to be a new and discreet incident.

(*Id.* at 13-14.)

In finding that Claimant's reason for resigning from her employment with Employer was unrelated to her work injury, the WCJ credited the testimony of Ms. Simon and Mr. Shearer, as well as Claimant's testimony to the extent that it was consistent with Ms. Simon's and Mr. Shearer's testimony. Based on this testimony, the WCJ found that Claimant specifically quit her employment due to the "stressful, and at times, dysfunctional" work environment. (*Id.* at 14.) The WCJ elaborated:

The specific impetus of Claimant's resignation was her response to a production error, which caused Claimant to profess that she was ill-suited for her job and could no longer handle the stress of the workplace. In the timeframe of that [sic] Claimant resigned, she made absolutely no mention that her left foot problems contributed to her decision to quit. While Claimant testified that she thought she could continue to handle the stressors of the job had it not been for her foot injury, that testimony struck me as being self-serving, and not truly reflective of the actual dynamics that led to her resignation.

(*Id.*)

Ultimately, the WCJ concluded that Claimant sustained her burden to prove that she suffered work-related os peroneum syndrome and a peroneal tendon injury on September 1, 2015, that led to Dr. Hogan's surgery and work-related

13

CRPS. The WCJ further concluded that Claimant also proved that she was disabled as of October 26, 2015, because, despite his finding regarding Claimant's resignation from her employment with Employer, the September 1, 2015 work injury prevented her from performing her pre-injury job as of October 26, 2015, the date on which Dr. Mares took her off work. Employer appealed the WCJ's decision to the Board, and the Board affirmed. Employer then petitioned this Court for review.

## II. ISSUES

On appeal,[3] Employer argues that the Board erred by affirming the WCJ's decision granting Claimant's Claim Petition because: (1) the testimony of Claimant's medical experts does not constitute substantial, competent evidence of record to support the WCJ's finding that Claimant sustained work-related os peroneum syndrome and a peroneal tendon injury on September 1, 2015; (2) there is not substantial evidence of record to support the WCJ's finding that Claimant developed work-related CRPS; and (3) there is not substantial evidence of record to support the WCJ's award of disability benefits from October 26, 2015, the date on which Claimant voluntarily resigned from her employment with Employer, through

---

[3] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

> "Substantial evidence" is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. In performing a substantial evidence analysis, the evidence must be viewed in a light most favorable to the party who prevailed before the WCJ. In a substantial evidence analysis where both parties present evidence, it is immaterial that there is evidence in the record supporting a factual finding contrary to that made by the WCJ; rather, the pertinent inquiry is whether there is any evidence which supports the WCJ's factual finding.

*Washington v. Workers' Comp. Appeal Bd. (Pa. State Police)*, 11 A.3d 48, 54 n.4 (Pa. Cmwlth. 2011) (citations omitted).

January 22, 2016, the date of Dr. Hogan's surgery (Post-Resignation/Pre-Surgery Period), or after December 19, 2016, the date on which Dr. Habib indicated that Claimant was capable of performing sedentary-duty work (Post-Surgery/Post-Work Release Period).[4]

## III. DISCUSSION

### A. Os Peroneum Syndrome and Peroneal Tendon Injury

Employer argues that the testimony of Claimant's medical experts does not constitute substantial, competent evidence of record to support the WCJ's finding that Claimant sustained a work-related tendon injury on September 1, 2015. More specifically, Employer argues that all three of Claimant's medical experts— Drs. Ginsburg, Hogan, and Habib—premised their causation opinions on the incorrect belief that Claimant's left foot symptoms began after the June 2015 and September 1, 2015 work-related incidents. Employer contends further that this belief is contrary to Claimant's medical records, particularly Dr. Ginsburg's June 23, 2015 office note, which demonstrate that Claimant's left foot symptoms began non-traumatically in early June 2015. In response, Claimant argues that the WCJ's finding that Claimant sustained a work-related tendon injury on September 1, 2015, that led to Dr. Hogan's January 22, 2016 surgery was based on substantial, competent evidence of record. Specifically, Claimant argues that Drs. Hogan and Habib credibly testified that Claimant's tendon injury and Dr. Hogan's January 22, 2016 surgery were directly related to the September 1, 2015 work-related incident. Claimant further contends that Drs. Hogan and Habib based

---

[4] Employer is not challenging the WCJ's award of disability benefits for the closed period of January 22, 2016, the date that Dr. Hogan performed surgery on Claimant's left foot, through December 19, 2016, the date on which Dr. Habib released Claimant to return to work in a sedentary capacity (Post-Surgery/Pre-Work Release Period).

their causation opinions not on incorrect beliefs or assumptions, but on Claimant's objective medical diagnostic studies, Dr. Hogan's surgical findings, and Claimant's prior medical records. Claimant also contends that Drs. Hogan and Habib were fully aware of Claimant's accident history and Dr. Ginsburg's June 23, 2015 office note, and both testified that Dr. Ginsburg's office note in no way altered their opinions as to the cause of Claimant's tendon injury.

In a claim petition proceeding, the claimant bears the burden of establishing all of the elements necessary to support an award of workers' compensation benefits, including the existence of an injury sustained in the course of employment and related thereto. *Giant Eagle, Inc. v. Workers' Comp. Appeal Bd. (Thomas)*, 725 A.2d 873, 876 (Pa. Cmwlth. 1999) (en banc). "As a part of this burden, the claimant must establish a causal connection between the disability and the work-related incident." *Id.* "[W]here there is no obvious causal connection between an injury and the claimant's employment, the claimant must establish that connection by unequivocal medical testimony." *Id.* If an expert's opinion is based upon an assumption which is contrary to the established facts of record, that opinion will not be considered competent to support a claimant's burden of proof. *Williams v. Workers' Comp. Appeal Bd. (Hahnemann Univ. Hosp.)*, 834 A.2d 679, 684 (Pa. Cmwlth. 2003). In determining the competency of a medical expert's opinion, this Court has explained that: "A medical expert's opinion is not rendered incompetent unless it is solely based on inaccurate or false information. The opinion of a medical expert must be viewed as a whole, and even inaccurate information will not render the opinion incompetent unless it is dependent on those inaccuracies." *Casne v. Workers' Comp. Appeal Bd. (Stat Couriers, Inc.)*, 962 A.2d 14, 16 (Pa. Cmwlth. 2008) (citation omitted).

16

Here, the WCJ's finding that Claimant's September 1, 2015 work-related incident caused her to sustain the tendon injury is supported by substantial, competent medical evidence of record. Drs. Hogan and Habib credibly testified that they diagnosed Claimant with the tendon injury and that the tendon injury was caused by the September 1, 2015 work-related incident. In addition, contrary to Employer's assertions, Drs. Hogan and Habib were aware of the history set forth in Dr. Ginsburg's June 23, 2015 office note and testified that such office note did not change their opinions as to the cause of Claimant's tendon injury. When questioned about Dr. Ginsburg's June 23, 2015 office note, Dr. Habib discounted its importance, explaining that, even if Claimant was experiencing issues with her left foot in June 2015, she was released back to full duty work in late July of that year. (R.R. at 472a.) Similarly, Dr. Hogan acknowledged Dr. Ginsburg's June 23, 2015 office note and the potential existence of ongoing left lower extremity pain but maintained that he still believed the September 1, 2015 incident caused Claimant's tendon injury and symptoms. (*Id.* at 352a.) Dr. Ginsburg also appears to have discounted the significance of her June 23, 2015 office note by explaining that she was treating Claimant for right hip issues and merely noted that Claimant complained of left lower extremity pain because it could have affected her gait, which in turn could have worsened her right hip symptoms. (*Id.* at 280a.) Even after Employer's counsel brought her June 23, 2015 office note to her attention on cross-examination, however, Dr. Ginsburg testified that it did not change her opinion that Claimant's CRPS related to the September 1, 2015 work-related injury. (*Id.* at 295a.) In sum, Drs. Hogan, Habib, and Ginsburg were all confronted with Dr. Ginsburg's June 23, 2015 office note and Claimant's prior complaint of lower left extremity pain and maintained their causation opinions; therefore, such opinions

17

were not rendered "solely on inaccurate or false information." *Casne*, 962 A.2d at 16. For these reasons, we conclude that the testimony of Claimant's medical experts constitutes substantial, competent evidence of record to support the WCJ's finding that Claimant sustained a work-related tendon injury on September 1, 2015.

## B. CRPS

Employer argues that substantial evidence of record does not exist to support the WCJ's finding that Claimant developed work-related CRPS. Specifically, Employer argues that, because Drs. Ginsburg, Hogan, and Habib all relied upon Dr. Chu's diagnosis and medical opinions—which Employer contends is inadmissible hearsay due to the fact that Dr. Chu did not testify before the WCJ— to conclude that Claimant developed post-surgical CRPS, the WCJ's finding that Claimant sustained CRPS as a result of the September 1, 2015 work injury is not supported by substantial evidence of record. Employer also contends that the WCJ improperly cited his own personal observations of Claimant's left foot in support of his finding that Claimant developed work-related CRPS because the WCJ did not document his observations on the record. In response, Claimant argues that the Board properly affirmed the WCJ's decision to grant her Claim Petition because the WCJ's finding that Claimant developed work-related CRPS was based on substantial evidence of record—namely Claimant's credible testimony regarding her ongoing symptoms following the January 22, 2016 surgery, and the credible testimony of all three of her medical experts who diagnosed her with work-related CRPS resulting from the September 1, 2015 work injury.

An expert may express an opinion based, in part, upon the reports and notes of other individuals upon which the expert customarily relies in his profession. *Sloane v. Workers' Comp. Appeal Bd. (Children's Hosp. of Phila.)*, 124 A.3d 778,

18

788 (Pa. Cmwlth. 2015); *Westinghouse Elec. Corp./CBS v. Workers' Comp. Appeal Bd. (Burger)*, 838 A.2d 831, 838 (Pa. Cmwlth. 2003). Thus, Drs. Ginsburg, Hogan, and Habib were permitted to rely on Dr. Chu's notes and diagnosis in forming their opinions relating to the cause of Claimant's CRPS, provided that Dr. Chu's notes and diagnosis did not form the sole basis for their opinions. Employer seems to suggest that Drs. Ginsburg, Hogan, and Habib rendered the CRPS diagnosis *solely* because such a diagnosis was contained in Dr. Chu's records. This contention, however, is at odds with their actual testimonies.

Dr. Ginsburg testified that she agreed with Dr. Chu's CRPS diagnosis *after* taking Claimant's history and performing her own physical examination. (R.R. at 267a.) She did not blindly rely on Dr. Chu's records to form the basis of her diagnosis but, rather, arrived at the same diagnosis after independently evaluating Claimant. Likewise, Dr. Hogan testified that, even though he believed in his mind that Claimant had developed post-operative CRPS and that he was qualified to make such a diagnosis, he referred Claimant to Dr. Ginsburg to confirm his diagnosis and to provide appropriate treatment. (*Id.* at 334a-35a, 338a.) Dr. Hogan also testified that based upon his examination of Claimant, the abnormal results of Claimant's diagnostic studies, Dr. Ginsburg's findings, and Dr. Chu's notes and diagnosis, Claimant was, "in [his] mind," suffering from CRPS "until proven otherwise." (*Id.* at 359a-62a.) Dr. Hogan arrived at his CRPS diagnosis based upon his own independent evaluation of Claimant, only part of which involved reviewing Dr. Chu's notes and diagnosis. Dr. Habib did not discuss Dr. Chu or his notes or diagnosis directly during his testimony. While he may have referenced a checklist prepared by another doctor to assess whether Claimant suffered from CRPS, Dr. Habib based his own CRPS diagnosis on Claimant's history, his review of

Claimant's medical records, his physical examination, and Claimant's diagnostic test results. (*Id.* at 460a-67a, 470a.) In sum, it is clear from the record that Drs. Ginsburg, Hogan, and Habib did not solely rely on Dr. Chu's notes and diagnosis to arrive at their CRPS diagnosis but, rather, conducted their own independent evaluation of Claimant and her condition.

In addition, while the WCJ may not have documented his observations of Claimant's left foot on the record, the WCJ's observations did not form the basis for his finding that Claimant developed work-related CRPS. In his decision, the WCJ stated: "I had the chance to view Claimant's foot during a hearing, and it did appear at least slightly discolored and swollen, with seemingly tensed toes." (WCJ's Decision at 13.) Prior to this statement, however, the WCJ credited and summarized the testimony and opinions of Drs. Ginsburg, Hogan, and Habib regarding Claimant's development of post-surgical CRPS. It appears to this Court that, after setting forth the basis upon which he found that Claimant had developed work-related CRPS, the WCJ recalled his observations regarding the condition of Claimant's foot simply to note that his observations were consistent with the observations of Drs. Ginsburg, Hogan, and Habib.[5] For these reasons, we conclude that the WCJ's finding that Claimant developed work-related CRPS is supported by substantial evidence of record.

---

[5] The WCJ also noted his observations when discrediting Dr. Kann's testimony: "[H]is description of Claimant's left foot having a normal appearance is at odds with the clinical finding of Claimant's treating physicians, and my assessment of her foot when viewing it." (WCJ's Decision at 13.) Again, it appears to this Court that the WCJ merely noted his observations as being consistent with those of Drs. Ginsburg, Hogan, and Habib.

## C. Award of Disability Benefits

Employer argues that substantial evidence of record does not exist to support the WCJ's award of disability benefits during the Post-Resignation/Pre-Surgery Period or the Post-Surgery/Post-Work Release Period.[6] More specifically, Employer argues that Claimant voluntarily resigned from her employment with Employer on October 26, 2015, and neither Dr. Hogan nor Dr. Habib offered any opinion regarding Claimant's ability to work prior to Dr. Hogan's January 22, 2016 surgery. Employer further contends that Dr. Habib indicated that Claimant was capable of performing sedentary-duty work as of December 19, 2016, and, but for Claimant's voluntary resignation, Employer could have accommodated her sedentary-duty work restrictions. In response, Claimant argues that there is substantial evidence of record to support the WCJ's award of ongoing disability benefits as of October 26, 2015, because Claimant testified that Dr. Mares took her off of work as of October 26, 2015, and, while Ms. Simon indicated that she had previously accommodated other employees, she did not specifically testify that Employer would have made accommodations for Claimant.

"In a proceeding on a claim petition, the claimant bears the burden of establishing a work-related injury rendering the claimant incapable of performing the time-of-injury job." *Vista Int'l Hotel v. Workmen's Comp. Appeal Bd. (Daniels)*, 742 A.2d 649, 654 (Pa. 1999). The claimant has the burden of proving not only that she is physically impaired but also that she has a loss of earnings as a result of the work-related injury. *BJ's Wholesale Club v. Workers' Comp. Appeal Bd. (Pearson)*, 43 A.3d 559, 562 (Pa. Cmwlth. 2012). "[Under] workers' compensation law, the term 'disability' means loss of earning power, not a physical disability caused by a

---

[6] Dr. Hogan released Claimant to return to sedentary duty work on December 23, 2016. (R.R. at 340a-41a.)

21

work injury." *Green v. Workers' Comp. Appeal Bd. (US Airways)*, 155 A.3d 140, 143 n.1 (Pa. Cmwlth.), *appeal denied*, 169 A.3d 1081 (Pa. 2017). Accordingly, it is only if that physical disability occasions a loss of earnings that a claimant will be "disabled" under the meaning of the Workers' Compensation Act[7] and will be entitled to receive disability compensation. *Id.* "Where a claimant establishes that a work-related injury prevents a return to the time-of-injury job, a loss of earnings capacity is established." *Vista Int'l Hotel*, 742 A.2d at 657. "Once such a loss has been demonstrated, the claimant should generally be entitled to benefits, unless the employer can demonstrate that employment is available within the claimant's restrictions." *Id.*

With respect to the WCJ's award of disability benefits during the Post-Resignation/Pre-Surgery Period, the WCJ appears to credit Claimant's testimony that Dr. Mares took Claimant out of work as of October 26, 2015. Claimant testified, however, that Dr. Mares had only "written [her] off of work for a week." (R.R. at 65a.) While Claimant may have suggested that she was not capable of performing her pre-injury position since at least October 26, 2015, the WCJ did not credit this testimony, and Claimant did not offer into evidence any medical testimony or records from Dr. Mares or any other doctor to support any disability during the Post-Resignation/Pre-Surgery Period. Drs. Hogan, Ginsburg, and Habib did not provide any opinion as to Claimant's ability to work until Claimant came under each respective doctor's care for the September 1, 2015 work-related injury, which occurred on December 14, 2015, May 3, 2016, and December 19, 2016. (*Id.* at 262a, 317a, 456a.) Out of the three, Dr. Hogan was the only doctor that treated Claimant prior to her January 22, 2016 surgery, and he

---

[7] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

22

testified only to Claimant's inability to work in any capacity following the January 22, 2016 surgery. (*Id.* at 329a.) Dr. Hogan did not comment on Claimant's ability to work prior to that time, other than to note that Dr. Mares had taken Claimant out of work for some unspecified period of time as of October 26, 2015. (*Id.* at 318a.) Medical evidence is necessary to establish that a claimant's disability—*i.e.*, loss of earning power—was causally related to the work-related injury. *See Sch. Dist. of Phila. v. Workers' Comp. Appeal Bd. (Lanier)*, 727 A.2d 1171, 1173 (Pa. Cmwlth. 1999). As there is a dearth of medical evidence in the record as to whether Claimant's September 1, 2015 work-related injury caused her to sustain a loss of earning power during the Post-Resignation/Pre-Surgery Period, we must conclude that the Board erred by affirming the WCJ's award of disability benefits for that time period.[8]

With respect to the WCJ's award of disability benefits during the Post-Surgery/Post-Work Release Period, however, the result is markedly different. Dr. Hogan credibly testified that he released Claimant to return to work in a sedentary-duty capacity as of December 23, 2016. (R.R. at 340a-41a.) Dr. Hogan specified that, in any sedentary position, Claimant would need to be able to sit seventy-five to eighty percent of the time, and she could not perform a job that required her to be on her feet fifty percent of the time. (*Id.* at 341a-42a.) Similarly, Dr. Habib credibly testified that, as of December 19, 2016, the date that he first treated Claimant, Claimant was capable of performing sedentary-duty work with very limited periods of standing. (*Id.* at 461a-62a.) According to the credited

---

[8] Based upon our review of Claimant's brief to this Court, it does not appear that Claimant has made any alternative argument that she should at least be entitled to disability benefits from October 26, 2015, through approximately November 2, 2015, for the week that Dr. Mares had restricted her from working.

23

testimony of Mr. Shearer, Claimant's pre-injury position required her to be on her feet in the warehouse about fifty percent of the workday. (*Id.* at 143a.) Thus, Claimant was not capable of performing her pre-injury position, the position from which she resigned, at the time that Dr. Habib released her to return to work in a sedentary-duty capacity on December 19, 2016. In addition, by not challenging the WCJ's award of disability benefits during the Post-Surgery/Pre-Work Release Period, Employer has conceded that, despite Claimant's voluntary resignation, Claimant established that her loss of earning power following the January 22, 2016 surgery was related to the September 1, 2015 work-related injury. As a result, Employer is essentially seeking to modify or suspend Claimant's disability benefits on the basis that Claimant is able to work. In order to do so, Employer was required to establish job availability—*i.e.*, that Employer referred Claimant to a then-available job that Claimant was capable of performing. *See Kachinski v. Workmen's Comp. Appeal Bd. (Vepco Constr. Co.)*, 532 A.2d 374, 380 (Pa. 1987). Employer simply did not meet this burden. For these reasons, we conclude that the WCJ's award of disability benefits during the Post-Surgery/Post-Work Release Period is supported by substantial evidence of record.

## IV. CONCLUSION

For all of the above stated reasons, we affirm in part and reverse in part the Board's order.

P. KEVIN BROBSON, Judge

Judge Wojcik did not participate in the decision of this case.

24

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Armstrong Kover Kwick, Inc.    :
and UPMC Benefit Management    :
Services, Inc.,    :
                Petitioners    :
    :
        v.    :    No. 434 C.D. 2019
    :
Workers' Compensation Appeal    :
Board (Michel),    :
                Respondent    :

## **O R D E R**

AND NOW, this 9th day of January, 2020, the order of the Workers'
Compensation Appeal Board is hereby AFFIRMED in part and REVERSED in part.

 

                                        P. KEVIN BROBSON, Judge